# Criswell *against* Altemus.

A copy of a will disposing of land in this state, made by a testator residing and afterwards dying in the state of Maryland, and placed on file and upon record in the office of registry of wills for Cecil county of that state, certified under the hand of the register of wills for the said county, and the seal of his office, accompanied by a certificate under the hand of E. C., chief judge of the orphan's court of the said county, that the copy of the will is attested in due form and by the proper officer, with a certificate subjoined thereto from the clerk of the orphan's court of the said county, under his hand and seal of office,

[Criswell v. Altemus.]

that the said E. C., by whom the immediately preceding certificate was made and subscribed, was, at the time of the doing thereof, chief judge of the said orphan's court, is admissible in evidence in ejectment to show title to the land thereby disposed of.

A deed of conveyance made in Cecil county, state of Maryland, transferring a right to land lying within this state, certified by J. B. E., under his hand as associate judge of the said county court, second judicial district of the said state, to have been acknowledged before him by the grantors therein named, accompanied by a certificate of the clerk of the said county court, that the said J. B. E. was one of the associate judges of the said second judicial district of the state of Maryland, in and for the counties of Cecil, Kent, Queen Anne and Talbot, at the time of taking such acknowledgement, is sufficient evidence of the execution of the deed to entitle it to be read in evidence.

The execution of a letter of attorney by the owner, or his guardian, of land lying within this state, giving authority to lease and take care of it for him, certified by E. C. as chief judge of the second judicial district of the state of Maryland, under his hand, to have been proved before him by the subscribing witness thereto, accompanied by a certificate from the clerk of Cecil county court, one of the counties composing the said district, that the said E. C., at the time of taking said probate, was chief judge of the said district, held sufficient evidence of the execution of the letter of attorney to make it admissible in evidence.

A person who enters without title, or colour of it, upon an unseated tract of land held by another, under a title derived from the commonwealth, as an intruder, erects buildings thereon suitable for the accommodation of his family, which he removes to the same, making it his place of abode, and occupying the whole of the survey or tract as the owner thereof, by clearing and fencing more or less of it from year to year, as suits his ability or convenience, for the purpose of tillage, meadow pasture, &c., using the woodland thereof at the same time for the ordinary purposes that such part of a tract or survey is generally used and occupied for, in the section of the state where it lies, returning also the whole of the tract as his own to the assessors, and paying the taxes assessed thereon, acquires thereby an actual, exclusive and adverse possession of the whole tract or survey, including the woodland as well as that which he has cleared and inclosed, whereby the owner is ousted; and if the latter does not enter or bring his action within twenty-one years from the time when the intruder first entered and took possession, he will be barred of his right thereto by the statute of limitations.

But if, in taking possession of the land, or afterwards, within the twenty-one years, the intruder declares or acknowledges that he is taking or holding the possession of the land for the owner or owners thereof, it cannot be deemed adverse, and consequently the statute will form no bar to the owner's recovery of the land.

So if there be several owners, holding their respective rights to the land as tenants in common, and the attorney in fact of the guardian of some of them, being infants, before the statute has run its full course, calls upon the tenant in possession, making known to him the claim of the infants and their right to the land generally, and the tenant thereupon agrees to pay the taxes that shall be assessed upon the land, and to hold and keep the possession thereof, without committing any waste, for the benefit of the infants, such agreement will enure to the benefit of the other tenants in common, so that the whole of the land shall be recovered in ejectment brought by them all or their assigns.

WRIT OF ERROR to the judges of the court of common pleas of *Indiana* county.

John Criswell, Sen., Robert Criswell and William M'Nutt, plain-

[Criswell v. Altemus.]

tiffs in error, but defendants below, against whom this action, being ejectment, was brought by Nicholas Altemus, and Henry Partridge and Jane Partridge by their next friend John Partridge, the defendants in error here, to recover the possession of three hundred and twenty-eight acres and one half of land.

The plaintiffs below, upon the trial, in order to establish their right to the land, gave in evidence a patent to Joseph Gilpin, dated the 14th of February 1775, surveyed on a warrant of the 4th of August 1773, to William Morrell, who conveyed to Thomas Fisher and Samuel Fisher, who conveyed to Joseph Gilpin.

The plaintiffs offered a writing, purporting to be a copy of the will of Joseph Gilpin, dated the 26th of December 1786, certified by Henry D. Miller, register of wills in Cecil county, Maryland, and certified by Enoch Cloud, chief justice of the orphan's court of that county, as follows:

Cecil county, ss.—In testimony that the foregoing is a true copy of Joseph Gilpin's will, now on file or record in the registry of wills' office for said county, I have hereto set my hand and seal of office, this 1st day of November 1833.

[L. S.]    HENRY D. MILLER, *Register of Wills, Cecil County.*

Maryland, Cecil county, ss.—I, Enoch Cloud, chief judge of the orphan's court of Cecil county, do certify that the foregoing attestation of Henry D. Miller is in due form and by the proper officer. Given under my hand, this 1st day of November, in the year 1833.

ENOCH CLOUD.

Maryland, Cecil county, ss.—I hereby certify that Enoch Cloud, Esq., by whom the aforesaid certificate appears to have been made, and whose name is thereto subscribed, is, and was at the time of making, chief judge of the orphan's court of Cecil county, and state aforesaid; and to all whose acts as such due faith and credit are and ought to be given, as well in courts of justice as thereout. In testimony whereof I have hereto set my hand and seal of office, this 1st day of November, A. D. 1833.

[L. S.]    HENRY D. MILLER,
*Clerk, Orphan's Court, Cecil County.*

This was objected to by the counsel for the defendants below, but was admitted and an exception taken.

The plaintiffs then offered in evidence a deed of conveyance, dated the 30th of October 1833, from Henry H. Gilpin, John Gilpin and William H. Gilpin to Mary Gilpin, all of Cecil county, acknowledged before John B. Eccleston, an associate judge of that county, and certified as follows:

State of Maryland, Cecil county, ss.—Be it remembered that on this 30th day of October 1833, before me, the subscriber, associate judge of Cecil county court, second judicial district of the state aforesaid, personally appeared Henry H. Gilpin, John Gilpin and William H. Gilpin, parties to the within deed or instrument of writing, and severally and respectively acknowledged the same to be their act

[Criswell v. Altemus.]

and deed, and the lands and premises thereby conveyed or mentioned, or intended so to be, and every part or parcel of the land to be the right and estate of Mary Gilpin, the other party to the said instrument of writing, according to the purport and true intent and meaning of the said deed and instrument of writing, and of the acts of assembly in such case made and provided. Acknowledged and certified by

JOHN B. ECCLESTON.

Maryland, Cecil county, ss.—I hereby certify that John B. Eccleston, Esq., before whom the annexed acknowledgement appears to have been made, and whose signature is thereto affixed, is one of the associate judges of the second judicial district of the state of Maryland, in and for the counties of Cecil, Kent, Queen Anne and Talbot, duly commissioned and sworn; and to all whose acts as such due faith and credit are and ought to be given, as well in courts of justice as thereout. In testimony whereof I have hereto set my hand and seal of office, this 30th day of October 1833.

[L. S.]                    JAMES SEWELL, *Clerk of said County Court.*

Which was objected to, but admitted and exception taken.

Plaintiffs then offered a writing purporting to be a copy of the will of Joseph Gilpin of Cecil county, dated the 7th of June 1832, with the attestation of Henry D. Miller, register of wills of that county, and a certificate of Enoch Cloud, chief justice of the orphan's court of that county, all as follows:

Cecil county, ss.—In testimony that the foregoing is a true copy taken from the original will now on file and recorded in the registry of wills' office for said county, I have hereunto set my hand and seal of office, this 29th day of October 1833.

[L. S.]    HENRY D. MILLER, *Register of Wills, Cecil County.*

Maryland, Cecil county, ss.—I Enoch Cloud, chief justice of the orphan's court of Cecil county, Maryland, do hereby certify that the above attestation is in due form of law, and that Henry D. Miller, Esq., whose name is thereto subscribed, is the proper officer for the attesting thereof. In testimony whereof I have hereto subscribed my name, this 31st day of October, A. D. 1833.

ENOCH CLOUD.

Maryland, Cecil county, ss.—I hereby certify that Enoch Cloud, Esq., by whom the annexed certificate appears to have been made, and whose name is thereto subscribed, is, and was at the time the said certificate appears to have been made, chief justice of the orphan's court of Cecil county, Maryland; and to all whose acts as such due faith and credit are and ought to be given, as well in courts of justice as thereout. In testimony whereof I have hereunto set my hand and seal of office, this 1st day of November 1833.

[L. S.]                    HENRY D. MILLER,
                    *Clerk, Orphan's Court, Cecil County.*

Which was objected to, but admitted and exception taken.

They then offered a deed of conveyance, dated the 30th of October 1833, from Mary Gilpin to Nicholas Altemus, acknowledged before

[Criswell v. Altemus.]

J. B. Eccleston, an associate judge of Cecil county court. Objected to, but admitted and exception taken.

They then read a copy of the will of Joseph G. Partridge, dated the 10th of April 1822, proved in Baltimore county on the 19th of May 1831.

Plaintiffs then offered a deed of conveyance of the 2d of November 1833 from John Partridge and Mary Partridge, of the city of Baltimore, to Nicholas Altemus, purporting to be acknowledged before John Purviance, one of the associate judges of Baltimore, and certified as follows:

State of Maryland, Baltimore city, ss.—Be it remembered, that on the 2d day of November 1833, personally appeared before the subscriber, one of the associate judges of Baltimore county court, John Partridge and Mary Partridge, parties grantors within named, and acknowledged the within deed or instrument of writing, to be their act and deed, according to the intent and meaning thereof. Taken and certified by

JOHN PURVIANCE.

State of Maryland, Baltimore city, ss.—Certificate of Thomas Kell, clerk of Baltimore county court, under his seal of office, that John Purviance was and is an associate judge of the sixth judicial district of Maryland, 2d of November 1833.

Objected to, but admitted and exception taken.

The record of an indictment to December sessions 1814, on a prosecution by Hannah M'Geary against Fanny Kiskaden, was then read, and the plaintiffs offered to prove by Mr Bryan, that he was one of the grand jury that found the bill, that Criswell was before them, that the complaint was against Leany and Kiskaden, that he, Criswell, said he was under a lease from Mr Stanard, but no lease was shown. He said it was a piece of land where one Kimpton lived, and he wanted to get Fanny off it. This was objected to by defendants, but the court admitted it, and exception was taken.

Plaintiffs then offered a paper purporting to be a certificate from the orphan's court in Cecil county, Maryland, dated 13th September 1834, that on the 10th of October 1808, Mary H. Gilpin was appointed guardian, &c. Certified. Objected to by defendants, but admitted and exception taken.

Plaintiffs then offered in evidence a power of attorney from Mary H. Gilpin, of Cecil county in Maryland, guardian of Joseph, Mary, Henry, John and William Gilpin, heirs of John Gilpin, dated 21st February 1818, purporting to have been acknowledged before James Purnell, a justice of the peace in Cecil county, and with an *affidavit* thereto annexed, made by Zebulon Rudolph, the subscribing witness, before Ezekiel Chambers, chief judge, certified as follows:

Maryland, ss.—Be it remembered, that on this 18th day of February 1835, personally appeared Zebulon Rudolph, whose name appears as a subscribing witness to the foregoing letter of attorney, before me the subscriber, chief judge of the second judicial district of Maryland, composed of the counties of Cecil, Kent, Queen Anne

[Criswell v. Altemus.]

and Talbot, and made oath on the holy evangels of Almighty God, that he did see Mary H. Gilpin, the party thereto (now named Mary H. Henderson), sign, seal and as her act and deed deliver the above and foregoing letter of attorney to and in favour of Daniel Stanard, Esq., and at the time of her doing so, the deponent did subscribe his name as a witness thereto. I do further certify, that the foregoing certificate, signed by James Sewell, clerk, is in due form of law and subscribed by the proper officer, and that full faith and credit ought to be given.

EZEKIEL CHAMBERS.

State of Maryland, Cecil county, ss.—I hereby certify that the honourable Ezekiel H. Chambers, Esq., who appears to have taken and signed the above *affidavit*, was at the time of the taking and signing thereof and since hath been and still is chief judge of the second judicial district of the state of Maryland, composed of the counties of Cecil, Kent, Queen Anne and Talbot, duly commissioned and qualified; and to all his acts as such, full faith and credit are and ought to be given as well in courts of justice as thereout. In testimony whereof I have hereto subscribed my name and affixed the seal of my office, this 20th day of February, A. D. 1833.

[L. s.]　　　　　JAMES SEWELL, *Clerk, Cecil County Court.*
Which being objected to, was rejected by the court.

The plaintiffs then again offered the same, accompanied by an offer to prove by Dr John Gilpin, that his mother Mary H. Gilpin, the grantor therein named, and Zebulon Rudolph, the subscribing witness, are residents of Elkton in the state of Maryland; that he is not acquainted with the handwriting of Rudolph, but that the signature of Mary H. Gilpin to the same is the proper handwriting of his mother. Whereupon the counsel for the defendants objected to the same, and the objection being overruled by the court, the counsel of defendants excepted.

Dr John Gilpin then testified: I think Zebulon Rudolph lived in Elkton in 1818. He has a farm near the town; am not acquainted with his handwriting; am acquainted with the handwriting of my mother, Mary H. Gilpin, and believe this to be her signature.

Power of attorney then read.

Daniel Stanard, Esq., deposed: After receiving the power of attorney, I had several conversations with Criswell and told him the tract of land belonged to the minor children of Mr Gilpin of Maryland. I told him to stay on it and take good care of it and commit no trespass and pay the taxes: he said he would do so. I think this conversation was within a year after I had received the power of attorney. The road from Indiana to Armagh passed this land. I had several conversations with him. I think I did not show him the power of attorney, nor do I recollect I told him that I had power to lease the land, but I told him I had power to act in their behalf. I was at the house of Mr Criswell with Dr Gilpin, and introduced him as one of the persons who had an interest in the land, and as one of

[Criswell v. Altemus.]

the minors that I represented to him before as owners. A good deal was said about the land, some of the family spoke of holding it, but Mr Criswell said little. I mentioned some conversation I had with Mr Criswell, when the suit was brought against Fanny Kiskaden by Thomas Gilpin. I think Mr Criswell was the first person from whom I heard the lands belonged to the Gilpins. I observed to him, that when I brought the suit in the name of Thomas Gilpin, he had told me to bring it, and that he would take care of the land for the owners, and that he told me, after that suit, he had got possession of the whole land and would take care of it for the owners and pay the taxes.

I do not think I ever went there expressly for the purpose of doing any thing about this land, but called there once or twice on my way to or from Armagh. I spoke to him, representing myself as the agent of Mary H. Gilpin on behalf of her minor children.

Cross-examined. I do not know how the suit came to be brought in the name of T. Gilpin. It was but for the purpose of turning them (Kiskaden and Leaden) out of possession, and that Criswell might get it. It appeared to me Criswell appeared to think I was the agent of the Gilpins, but I was not then the agent of the Gilpins who now claim the land.

Plaintiffs' points.

The court are requested to charge the jury : 1st. That if they believe John Criswell did not claim the land in dispute adverse to the holders of the original title, the plaintiffs are not barred from the recovery of any part of the land.

2d. That if they believe the possession of John Criswell was adverse to the owners of the original title ; yet the plaintiffs are not barred by the statute of limitations, except as to such part of the land as he had cleared and inclosed in fence twenty-one years before the entry of Dr John Gilpin.

3d. That if John Criswell occupied the tract of land in dispute by permission of the heirs of John Gilpin, from the year 1819, his possession is not protected by the statute of limitation.

Defendants' points :

1st. The court is requested to charge the jury, that if they believe the defendant entered on the land in 1803, claiming the same as his own, and has continued to reside thereon ever since, extending his improvements, paying the taxes assessed thereon ; and that the plaintiff, or those under whom he claims, did not cause the same to be taxed to them, nor did they or any of them pay said taxes, or any part of them, an ouster may and ought to be presumed, and the defendants are therefore protected by the statute of limitations.

2d. Also, that if they believe Rachel Gilpin died in 1802 without issue, and that John Gilpin died in 1808, and that adverse possession was taken by the defendant in 1803 or 1804, and has continued ever since, the plaintiff is barred by the act of limitations, notwith-

[Criswell v. Altemus.]

standing there might have been subsequent disabilities arising from infancy or coverture in any of those under whom the plaintiffs claim.

3d. Also, if the jury believe that the defendant did not enter on the land in controversy, under any contract with Joseph Gilpin, or those claiming under him, that such entry followed up as it has been by possession, &c. was adverse to the right of those under whom the plaintiffs claim, and the defendants are protected by the statute of limitations.

4th. Also that the jury may and ought to presume the entry and possession of the defendant to have been adverse to the right under which the plaintiffs claim, from the circumstance of his making large and valuable improvements, and paying the taxes.

5th. That any declarations made about buying from legal owners, or keeping possession, or the like, can have no effect against the title acquired by the long possession and other facts proved in the case.

Charge of the court (Young, President).

The plaintiffs have exhibited what is termed a good legal title to the lands in question : objections were taken to certain evidence adduced in support of this title, but this court having admitted it, the defendants may, if so advised, have our opinion reviewed in the supreme court, and if adjudged erroneous, be set right by that court. Regarding therefore the legal title of the plaintiffs to recover on the evidence, the defendants have set up on their part what is termed an equitable title, by actual settlement on the place, and extensive improvements thereon, commencing about thirty years before the institution of the present suit, and the payment of taxes for various years from the year 1808 inclusive. Their counsel in addressing you on the whole of the evidence rely principally on those facts, and the operation of the act of limitations passed in the year 1785 ; which, it is contended, are a bar to the recovery of the tract, or any part of it, by the plaintiffs. On this subject we have been requested to charge you in point of law, by five distinct propositions on the part of the defendants. Before I proceed to give an opinion on these several propositions, I will state briefly the substance of the whole evidence. The plaintiffs' title is founded on a patent to Joseph Gilpin, dated the 14th of February 1775. By his last will he devised the premises to his daughter Rachel, who appears to have died intestate and unmarried. The property then descended to her five brothers and sisters, then surviving. Two of them died unmarried and intestate ; a third, Elizabeth, although married, left no issue, and died intestate. The two others, John and Mary, then became seised or entitled to the whole tract as tenants in common. John died intestate, leaving five children, viz. Joseph, who devised to Mary his sister all his estate for life, and on her decease to his three brothers Henry, John and William, by will dated the 7th of June 1832. She afterwards, on the 30th of October 1833, acquired the

[Criswell v. Altemus.]

right to their remainder of the land, and thus acquired a moiety of the whole, and conveyed the same to Nicholas Altemus, one of the plaintiffs. It appears that Mary, the daughter of the patentee, succeeded to the other moiety, and was married to James Partridge, leaving one son, named Joseph G., who by his last will, dated the 16th of April 1822, devised to his father, James, in trust for the use of Mary, John, Henry and Jane, all his estate, real and personal, with certain powers to dispose of the same, which do not appear to have been executed. It appears that the executor and trustee died some years ago. A deed from John and Mary to the plaintiff Altemus, for their interest, has been given in evidence; thus he became the legal owner of their share, and his brother Henry and sister Jane have been joined with him in the present suit to recover their respective interests in the whole tract. In support of the defendants' claim by occupation under the limitation act the proof has been clear that it commenced in the fall of 1803, and extensive improvements have been since made thereon, besides paying taxes on half the tract for some years, and on the whole or the most of it since the year 1808. There is no testimony of his having paid previous taxes, nor can it be presumed that the defendants did pay any of them. There is some testimony of another improvement on the same tract by other persons before the defendants' entry on it; and that in 1813 or 1814 part of it was entered on by one Leany and a woman of the name of Kiskaden, adversé to Criswell, and that an indictment was preferred against F. Kiskaden by him for an assault and battery on him, at December sessions 1814, and on his examination before the grand jury, the witness, Mr Bryan, (being a member of that body) stated the tract in question belonged to some person or persons named Gilpin. It appears that on some occasions he claimed the whole tract, and on others not. I am of opinion however that mere claim to land to which another has a complete legal title, in the absence of the owner, especially if a minor living at a great distance and totally ignorant of such claim, ought not to be regarded with much favour. The owner by such a title has a constructive possession in the whole; he may indeed be disseised of it by another, and the constructive possession in the owner affected to the extent of the actual possession taken by the disseisor, although regarded by the law as a trespasser; and if the owner being of full and mature age, which is twenty-one years, will lie by and acquiesce without entry on the land to avoid the disseisor and prosecute his right, within the period required by law for that purpose, which by our act of assembly is twenty-one years from the commencement of the disseisin, the law will begin to operate. If, for instance, the entry was into a tenement or house, with cleared or improved land adjoining the same, the disseisin will relate to the time of the actual dissseisin. But if the entry by way of disseisin was on a tract of land held by a legal title, without any previous actual possession by the owner or some person in his behalf, the disseisor acquires a right to only so

VII.—2 Y

[Criswell v. Altemus.]

much of the land as he shall have taken actual possession of twenty-one years previous to the period of the owner coming forward to maintain his title, by entry either personally or by authorizing another to do so in his behalf; and in case of the person in possession refusing to give it up, which would be full evidence of holding adversely to the owner, in that case, unless an entry by the principal or his agent be continued from year to year, the owner is bound to institute his suit at law against the party in actual possession. This I consider to be the good ancient law of the land; and although it has been somewhat disturbed by new fangled notions, and in some places by popular prejudices, I think it on the whole the safest and best for the public interest, as well as that of individuals. The weight of all the decisions in our supreme court, that of many other states as well as that of the highest tribunal, that of the supreme courts of all the states, is to support the rights of private property, in opposition to all violation of it by trespassers or wrong doers. It is contended for the defendants that Criswell's entry in 1804 was a disseisin of the whole tract, and that it thus extends to all the land opened and cultivated since that year until now, which appears to amount to one hundred and twenty acres. But if any part of this quantity was not cleared twenty-one years before the present suit, so far his claim would fail, even if the rights of minors had not been in question. It is contended that the payment of taxes, independent of improvements, gives the defendant Criswell a right to hold the land, and is a kind of evidence of adverse possession. A late case has been cited apparently favourable to that opinion; but howsoever respectable the judge is who broached it, the circumstances of that case differ materially from the present one. Here the grounds taken for raising an adverse possession to the real owners are removed by the testimony of several witnesses, particularly by that of Mr Stanard, to whom a letter of attorney, from Mary Gilpin, the guardian of her minor children, was sent, it may be presumed shortly after its date, the 21st of February 1818. This ought to be regarded as what the law terms an attornment or express recognition of the title of these minors to the land, or at least such a portion thereof as they then had a legal right to have, and which carries with it a constructive possession to the whole not then cleared, as well as to what was then in the actual possession of Criswell. He then became a tenant at will, which is now regarded as from year to year, subject to the payment of taxes, as most leases in newly settled countries are, without any particular rent. Such a contract was not binding on Mary, the wife of James Partridge, if she was then living, or on her son, Joseph G., who it appears was then living; but their silence amounts to an acquiescence in what had been done by Mary Gilpin, whose acts as guardian for her children, by her attorney, Mr Stanard, are available to all having right under the original patentee. The entry of John Gilpin on the land in 1828, Mr Criswell showing him the lines of the tract, his offer to buy at one time for 2 dollars

[Criswell v. Altemus.]

an acre, and at another as he believes for 2 dollars and 50 cents, tend to show that whatever his first intentions were he did not claim or hold adversely to the true owners. It appears that he held out to other persons a wish or intention to buy. To one of them regretting that he had been disappointed, and applying an angry epithet to the plaintiff, Altemus—His purchase may be regarded as unneighbourly. Be that as it may, it was not contrary to any law of this state. When he agreed to keep possession of the tract under Mary Gilpin, paying the taxes according to the testimony of Mr Stanard, which is not contradicted, which was within a year after he had received the power of attorney, and as he further testified he had at different periods seen Criswell and talked on the subject, the act of limitations then ceased to run against the plaintiffs as to the whole. If informed of this by the agent they would doubtless come to the conclusion that their rights were safe. If Mr Criswell had, instead of agreeing to hold on, declared to Mr Stanard that he would not on such terms, or any other, but would keep possession adversely and on his own claim, such as it was, the case would have had a different aspect. The consequence, at least the probable effect, would have been the institution of an action of ejectment to recover possession, in which neither it, not being beyond eighteen years from the time of defendants' entry, or the payment of a few years' taxes, would have afforded the shadow of a title under the limitation act, even if there had been no minors in the case. As to their rights the law is especially careful. To wrong or oppress the widow or the fatherless is regarded by the divine law the highest degree of injustice ; courts and juries therefore ought to be very careful in administering their duty where those interests are at stake. I might here leave the whole case to you, but it being my duty to notice the propositions of the defendants' counsel, I proceed to give the following answers :

As to the first point, I am of opinion that from the circumstances stated, connected with the evidence on the part of the plaintiffs, no ouster ought to be presumed, and therefore the defendants are not protected by the act of limitations.

2d. The plaintiffs are not barred from a recovery by the limitation act by the circumstances stated in this proposition. There is no direct testimony as to the time of Rachel's death. Then, as I have already observed, the act of limitations ceased to operate after the year 1818, if you believe the testimony of Mr Stanard.

3d. As to any contract such as is mentioned in this proposition, this depends principally on the testimony of Mr Stanard, as to which I have already given you my opinion. You will form your own. But independent of this testimony, if you are satisfied that the five children of John Gilpin, at the time testified to by Dr Gilpin, who is one of them, cannot be supposed mistaken on the subject, the defendants, as to the moiety claimed by Criswell, are not protected by the limitation act.

[Criswell v. Altemus.]

4th. This presumption does not legally arise from the circumstances mentioned, as I have before stated in my charge to the jury.

5th. The declarations of a party against his own interest, especially to persons, or their lawful agents, having an opposite interest, are always entitled to great weight, while those in favour of his own interests are entitled to little if any weight whatever.

To this opinion and the answers of the court to the several propositions the defendants' counsel excepted, and requested the court to sign this bill of exceptions, which is done accordingly.

*Alexander*, for plaintiffs in error, cited, 3 *Penns. Rep.* 134; 10 *Serg. & Rawle* 306; 17 *Serg. & Rawle* 356; 3 *Watts* 69.

*Buffington*, for defendants in error, cited, 1 *Watts* 110; 3 *Serg. & Rawle* 381; 3 *Penns. Rep.* 134; 5 *Watts* 365, 386.

The opinion of the Court was delivered by

KENNEDY, J.—The first matter assigned for error is the bill of exception to the opinion of the court below, admitting a certified copy of Joseph Gilpin's will to be read in evidence to the jury. The objection to its being read was, that it did not come within the provisions of the acts of congress making certified copies of matters placed on record in one state, in conformity to the laws thereof, admissible in evidence so as to entitle them to the same faith and credit in every other state that they have in the state where the record is, when authenticated in the manner thereby prescribed. The act of congress of the 26th of May 1790 provides for the authentication of the acts of the legislatures of the several states, and the records and judicial proceedings of the courts thereof. After which the supplement thereto of the 27th of March 1804 was passed, making all *records* and exemplifications of office books, which are or may be *kept in any public office* of any state, not appertaining to a court, admissible evidence in any other state, when attested by the keeper of the said *records* or *books* and the seal of his office thereto annexed, if there be a seal, together with a certificate of the presiding justice of the court of the county or district, as the case may be, in which such office is or may be kept, that the attestation is in due form and by the proper person. The certified copy of Joseph Gilpin's will, whether the office of register of wills in Maryland appertains to the orphan's court or not, would seem to be authenticated in such manner as to entitle it to be read in evidence in the court below. It is certified or attested by the register of wills of Cecil county, Maryland, under the seal of his office; to which there is subjoined the certificate of the chief judge, Enoch Cloud, of the county of Cecil, Maryland, under his hand, showing that the attestation of the register is in due form and by the proper officer, with the certificate, also, of the clerk of the said orphan's court, under his hand and seal of office, that Enoch Cloud was, at the time of giving his certificate, the chief

[Criswell v. Altemus.]

judge of said court: and the said orphan's court being a "county court," or court of Cecil county, wherein the record of the will was kept, and Enoch Cloud chief judge of it, he may very fairly, in the absence of any thing showing the contrary, be regarded as the "presiding justice" of the court of that county, according to the language of the act of 1804. From the form of the certificate of the chief judge here, however, I would infer that the office of register of wills, in Maryland, does not necessarily appertain to the orphan's court; because, beside certifying that the register's attestation is in due form, he has superadded that it is also by the *proper person*, which latter clause seems to be required only where the office does not appertain to any court. But supposing it is not authenticated in the manner and form required by the acts of congress, or that it does not come within the provisions thereof, so as to entitle it to the same faith and credit that would be given to it in Maryland, still we think it was admissible as *prima facie* evidence at least, according to the principle of Baker *v.* Field, 2 *Yeates* 532, and Ralston *v.* Cummins, cited there.

The second matter assigned for error is also a bill of exception to the opinion of the court, admitting a deed of conveyance appearing to have been made in the state of Maryland, dated the 30th of October 1833, by Henry H. Gilpin, John Gilpin and William H. Gilpin to Mary Gilpin, transferring to her their interest in the land in dispute. The objection to its being read in evidence was, that it was not acknowledged nor proved, and one or the other certified to have been done before and by a proper officer, in the manner required by our acts of assembly, so as to render it admissible in evidence, without the execution thereof being first proved as directed by the rules of the common law.

It is perfectly clear, that if this deed had been certified by one of the associate judges, under his hand, of any county of this state, to have been acknowledged before him by the grantors therein named, it would, without more, according to the express provisions of the act of the 13th of April 1791, have been entitled to be recorded, and consequently have become admissible in evidence without further proof of its execution. Then, by the first section of the act of the 23d of March 1819 it is enacted, among other things, that all bargains and sales, deeds, conveyances and other instruments of writing concerning any lands or hereditaments lying within the state, made thereafter out of the state, and duly acknowledged by the party or parties executing the same, or proved by the oath or affirmation of one or more of the subscribing witnesses thereto, before any one of the judges of the courts of common pleas of any state or territory within the United States, and so certified under the *hand* of the said judge and *seal of the court*, shall be as valid to all intents and purposes, and shall have the like effect and be in *like manner entitled to be recorded* as if they had been made and acknowledged and certified in conformity to any law of the commonwealth. Here the ac-

VII.—2 Y*

knowledgement of the deed in question, according to the certificate thereof, appears to have been made before a judge of the court of Cecil county, in the state of Maryland, which is a court of *common pleas* of that state. He has certified the fact of its being acknowledged by the parties executing the deed before him, under his *hand* and the *seal of the said court.* This brings it within, as it were, the very letter as well as the meaning of the act of 1819.

The third and fourth bills of exception each present the same question as the last or second, and are therefore disposed of in the same way.

The fifth bill of exception, which is the next error assigned, was taken to the opinion of the court below, admitting the testimony of ———— Bryan, who was a member of the grand jury at December session of the court of quarter sessions of Indiana county 1814, in order to prove that John Criswell, one of the defendants below, was produced as a witness before the grand jury during that session of the court of quarter sessions, on a bill of indictment against a certain Fanny Kiskaden, and, *inter alia,* testified that he held the land in dispute under a lease from Mr Stanard. By other evidence given on the trial of the cause it appeared that Mr Stanard had a letter of attorney from Mary Gilpin, dated in February 1818, executed by her as the guardian of her children, then in their minority, from whom Altemus, one of the plaintiffs below, has, since they attained full age, derived by purchase his claim to the land; and that Criswell considered Mr Stanard the agent of the Gilpins, whom he regarded as the owners of the land before that; though Mr Stanard testified that in fact he was not so, yet it appeared to him that Criswell thought he was at the time of the indictment, if not before. The testimony of Bryan, therefore, would seem to have been material, or at least not irrelevant, as it tended to prove that Criswell did not, at the time, hold the possession of the land adversely to the Gilpins, whose right to it he seemed to consider indisputable. It was said that no such lease was produced, which would have been better evidence of the fact; nor yet was any account given of it, showing that it was lost, destroyed or, for any other reason, could not be produced. In reply to this, however, it is sufficient to say, that it did not appear from what Criswell, in giving evidence, said, that it was in writing; for aught that was proved to have been said by him, it might have been a verbal lease. But even if it had been declared by Criswell to be in writing, I do not see that it would have imposed the production of it upon the plaintiffs below; because whether he had ever taken such lease or not, his declaration that he had, was evidence against him without it, inasmuch as it went to show that he did not then hold the land adversely, but in subordination to the title of the Gilpins. The evidence was therefore properly admitted.

The sixth exception was to the admission of a certificate, duly authenticated, as it would seem, from the orphan's court of Cecil county, in the state of Maryland, showing the appointment of Mary

[Criswell v. Altemus.]

H. Gilpin by that court on the 10th of October 1808, guardian of the children of John Gilpin, her late husband and herself, being then in their minority, and from whom Altemus derived his claim to the land after they arrived at the age of majority. We perceive no good objection to this evidence : on the contrary, we think it was admissible and pertinent, because it tended to prove that she, in giving to Mr Stanard a letter of attorney, as guardian of her children, authorizing him to look after the land in dispute, one half of which, at least, belonged to them, and to do whatever might be requisite in order to secure it for them, was doing nothing more than fulfilling a duty devolved upon her by virtue of the appointment, if not by the natural relation in which she stood to them, evidenced by the certificate.

The seventh bill of exception is to the admission of the letter of attorney, before mentioned, from Mary Gilpin, as guardian of her children, to Mr Stanard, dated the 21st of February 1818, authorizing him to take possession of the land and to lease it. This letter of attorney being an *instrument concerning lands lying within this state,* and the execution thereof being certified by Ezekiel Chambers, chief judge of the second judicial district of the state of Maryland, composed of the counties of Cecil, Kent, Queen Anne and Talbot, under his hand, to have been proved before him by Zebulon Rudolph, the subscribing witness thereto, and accompanied by the seal of the court of Cecil county, one of the counties of the said district, wherein the probate was made, rendered it clearly admissible in evidence, according to our acts of assembly, without further proof of its execution. It would seem to be admissible either under the act of the 24th of February 1770 or the act of the 23d of March 1819. The terms of either, or both, are sufficient to entitle it to be given in evidence as it was.

Though numerically there are seven errors remaining beside those which have been remarked on, yet there seem to be but two questions, at most, material to the issue here presented by them. The first is, supposing that the jury, from the evidence, should have been of opinion that Criswell, the elder, one of the defendants below, had entered and settled upon the land in question adversely and without colour of title in 1805, after having commenced improving thereon previously; and had continued in the actual possession thereof claiming it as his own to the extent of the official survey, by extending his improvements every year, in clearing, fencing in and cultivating more and more of the land, as well as adding to the buildings thereon; and from the year 1808, if not before, had returned the whole of the tract or survey to the assessor as his own and paid the taxes assessed thereon, without any taxes having been assessed in the names of, or paid by, the real owners from those years down to the commencement of this ejectment, ought not the jury to have found therefrom an *ouster* by Criswell of the plaintiffs below and those under whom they claim, not merely of the land actually cleared

and inclosed by Criswell for the space of twenty-one years before the commencement of the action, but of the whole of the survey ?

The second question is, was the evidence given on the trial of the cause, such as that the jury could clearly infer therefrom, that Criswell did not intend to hold the land adversely to the title of the plaintiffs below, but in subordinancy to it ?

As to the first, the court below, in their charge delivered by the president judge to the jury, appear to have answered it in the negative; in which we think they were wrong. The affirmative is plainly laid down by the late Chief Justice Tilghman in Royer *v.* Benlow, 10 *Serg. & Rawle* 306; again by Mr Justice Rogers in Read *v.* Goodyear, 17 *Serg. & Rawle* 351; then by Mr Justice Huston in Jones *v.* Porter, 3 *Penn. Rep.* 135; and lastly, by the present chief justice in M'Call *v.* Neely, 3 *Watts* 73; and in the preceding pages, he brings the principles of the common law in reference to disseisin, to bear upon and support it. Though I cannot recur to any case where the question has been raised directly and adjudicated by this court in the affirmative; nor am I certain that any such has occurred; yet such has been the settled opinion in it for some time back, that where an intruder enters, without colour of title, into and settles with his family upon, an unseated tract of land belonging to another, who claims it under a warrant and survey, either with or without a patent from the commonwealth; and having settled upon it, claims it as his own by exercising acts of ownership over it from year to year, in putting up buildings upon it, clearing and fencing more or less of it and using the whole of it according to the custom of the country, that is, the clear land either as arable, meadow or pasture, and the woodland for obtaining from it timber as often as the settler shall have occasion for it to answer his purpose, also returning the whole of it to the assessors as his own and paying the taxes thereon when assessed for a period of twenty-one years, will be sufficient, under the operation of the statute of limitations, to protect him in the possession of the whole of the tract or survey including the woodland as well as the improved parts of it. In short it will give him a right or title to the whole of it, and were he to be dispossessed against his will might recover the possession upon it in an action of 'ejectment, even against the former owner who had lost his right by the statute. Stokes *v.* Berry, 2 *Salk.* 421. Such possession and use of the land by the intruder cannot be, and certainly is not, according to the common understanding of mankind, considered less than an adverse actual possession of the whole tract, as also an actual *ouster* of the true owner to the same extent. Generally the woodland of seated tracts is not fenced or inclosed in any way, but timber taken from it by the occupant of the cleared parts when he has occasion for it; and this, until the greater portion of the tract shall become clear land, is the only practical use that can be made of the woodland part of it; and being thus used by him, I think I may say that he is universally looked on as having the actual possession of it. This being

[Criswell v. Altemus.]

the case, it would seem to be an evasion of the statute to hold otherwise. The design of the statute was not only to give peace and quiet to the community, but likewise to protect men in the possession and enjoyment of lands which they had held and been improving, perhaps at great expense or the whole labour of the better part of the occupant's lifetime, for the space of twenty-one years. For the purpose of promoting these objects the statute ought to be favourably construed. Long experience has proved most satisfactorily the policy of it. It is the interest of the state that the lands within it should be improved and rendered as productive as possible; but this cannot be expected unless the possessors of it shall, after a reasonable length of time, be made perfectly secure in their possession. The whole state being in a progressive state of improvement, in which every one ought to join and to exert himself according to his means in order to increase the power and resources of the state, the statute of limitations, it will be found, will be the only safeguard which many will have for the money and labour expended and used by them in the laudable work. The security of all men depends upon it, say the court in Green *v.* Rivett, 2 *Salk.* 422, and therefore it ought to be favoured.

But notwithstanding the court erred in their direction to the jury on this point, still, if the second point was rightly answered by them, we think that the judgment ought not to be reversed for the error in the first; because the verdict of the jury being in favour of the plaintiffs below for the whole of the land, we must necessarily suppose or conclude that they founded their verdict entirely upon the instruction which they received from the court answering the second question in the affirmative.

Then as to the second question: were the court correct in their instruction to the jury by way of answer to it. In order to prevent the possession taken of land by a person, without either title or colour of it, from being adverse, it is not requisite that he should enter under any previous agreement made with the owner or, as I conceive, that he should even know personally who the owner is. It is sufficient to prevent its being considered adverse, that the party taking possession intends to occupy the land subject to the will of the owner whoever he may be: and if this be made to appear clearly by the evidence, the statute of limitations will form no bar to the owner's recovering possession whenever he shall think proper to demand it.

The plaintiffs below claimed under a title which was shown to have been vested in a certain Joseph Gilpin, as early as 1775, by a patent from the commonwealth; who, it would seem, continued to be the owner of the land till his death. Previously thereto he made his will, devising it in fee to his daughter Rachel, who continued thereafter to be the owner of it till her death. Whether she was living or not at the time Criswell first settled upon it does not appear distinctly from the evidence. But about that time she died unmarried, intestate and without issue, leaving however five brothers and

sisters, her heirs at law, to whom it descended.    The title to the
whole of the land in dispute may be said to have continued in the
Gilpin family until Altemus, one of the plaintiffs below, became a
purchaser of part of their interest or right in it in the year 1833.
Criswell seems to have been aware at the time that he first entered
upon the land, or at least not very long afterwards, that the title to
it was in a person or persons of the name of Gilpin, and that he,
she, or they were the true owners thereof, though personally they
were unknown to him.    From the evidence it would appear that he
considered the Gilpin title irresistibly good, for he caused a suit to
be brought in the name of Thomas Gilpin in 1814, to remove a
Fanny Kiskaden, who had come and settled upon the land previ-
ously to that.    Not being personally acquainted however with the
Gilpin family connected with the title to the land, he had the suit
brought in the name of Thomas, which was a mistake ; but still he
effected his purpose in the suit, notwithstanding this mistake, of
getting possession of the whole of the land.    It was also about this
time that he testified before the grand jury of the county that he
held the land under a lease from Mr Stanard, whom he seemed to
think, according to the evidence of Mr Stanard, was the agent of
the Gilpins having the title to it.    And as it does not appear that
any person of the name of Gilpin, other than those from whom the
plaintiffs below derive their title to the land, ever even pretended a
claim to it, the jury might fairly infer that the plaintiff's title was
the one to which Criswell had reference as often as he spoke of the
Gilpin title, and declared that he held and would keep the posses-
sion of the land in subjection to it.    But according to the testimony
of Mr Stanard the possession of Criswell in 1818 or 1819 became, by
his own agreement, united directly with the title of the plaintiffs below,
some four or five years at least before the statute of limitations could
have run, supposing the previous possession of Criswell to have been
adverse from its commencement in 1803 down to that time.    Mr
Stanard's testimony is, that within a year after he received the letter
of attorney from Mary Gilpin, guardian of the children of her late
husband, John Gilpin, which is dated the 21st of February 1818,
" he had several conversations with Criswell, in which he told
him the tract of land belonged to the minor children of Mr Gilpin,
of Maryland.    He told him (Criswell) to stay on it, and take good
care of it, and commit no trespass, and pay the taxes ; he (Criswell)
said he would do so."    Mr Stanard also testifies that he told Cris-
well that he had power to act on their (the minor children's) behalf.
It would also appear from Mr Stanard's testimony that this took
place at the house of Criswell on the land, when he (Mr Stanard)
happened to be passing that way to the town of Armagh.    Mr Stan-
ard further testifies that when he called at the house of Criswell, in
company with Dr John Gilpin, one of the children and heirs of
John Gilpin deceased, for whom Mary Gilpin had been guardian,
which as Dr Gilpin testifies was in the fall of 1828, he reminded

[Criswell v. Altemus.]

Criswell of the conversation he had had with him when the suit (before alluded to) was brought against Fanny Kiskaden by Thomas Gilpin in 1814, by observing to Criswell " that when he (Mr Stanard) brought the suit in the name of Thomas Gilpin, he (Criswell) had told him (Stanard) to bring it, and that he (Criswell) would take care of the land for the owners ; and that he (Criswell) told him (Stanard), some time after that had been brought, that he (Criswell) had got possession of the whole land, and would take care of it for the owners and pay the taxes." To the truth of this it would seem Criswell gave his silent assent. Mr Stanard also testifies that he thinks Mr Criswell was the first person from whom he heard that the land belonged to the Gilpins. Now, there being nothing shown on the trial of the cause tending to prove that Mr Stanard was mistaken in his testimony, or which went to impugn it in the least, the jury could not avoid coming to the conclusion that Criswell had agreed to hold possession of the whole of the land in subordination to the title of the Gilpins. If the evidence is believed, it is clear that he agreed to this without any qualification or condition whatever. Then his possession of the land could not be *adverse*, and without this the statute could not operate or run in his favour. To hold otherwise would be permitting him to practise a gross and palpable fraud upon the Gilpins or owners of the land, by inducing them to believe, by his promise, that he would surrender the actual possession of the land to them at any time when required ; so that under the confidence thus induced he might be permitted to remain in possession until after the *twenty-one years had run*, and then set up the statute as a bar to their claim. Whereas if he had refused to hold it under them they could, and doubtless would, have brought their action of ejectment, and turned him out of it. But it is objected that Mr Stanard, at most, had only an authority to act for the children of John Gilpin, who were the owners of but one half of the land ; and that the agreement of Criswell must be limited according to the right of those on whose behalf Mr Stanard acted ; and the subordinate possession of Criswell therefore restricted to one half of the land ; leaving his possession as to the other half adverse, and consequently protected by the statute of limitations. In answer to this, however, it must be observed that the acts of Mr Stanard are to be regarded as the acts of those for whom he acted, and as if done by themselves ; and that his going upon the land to Criswell, and making known to him the right and claim of the children of John Gilpin to it, upon which Criswell agreed to hold the possession under and for them, was equivalent to their entering and taking the actual possession of the whole of the land themselves. See Wells *v.* Prince, 4 *Mass. Rep.* 64. If they had done so, being the owners of an undivided moiety of it, and tenants in common, in 1818 and many years afterwards, with Joseph G. Partridge, their cousin, who was the owner of the other moiety, they would be considered as having entered and taken possession for

[Criswell v. Altemus.]

him as well as for themselves, especially as there does not appear to have been any dispute or disagreement between them at any time in regard to their respective rights and interests in the land. It seems to be well settled that the possession and seisin of one tenant in common is the possession and seisin of another, because such possession is not *adverse* to the right of his companion, but in support of their common title. 1 *Inst.* 189, *a.*, 199, *b.*; *Cro. Eliz.* 641; 2 *Cruise's Dig.*, *tit.* 20, *Tenancy in Common*, sec. 14 ; Sterling *v.* Penlington, 14 *Vin. Abr.* 511; Smales *v.* Dale, *Hob.* 120. In this latter case it is reported by lord Hobart to have been decided that the entry of one tenant in common may be in three ways : either in the name of herself or her fellow ; or *generally*, which shall always be taken *according to right*, as being *under construction of law*, and therefore lawful ; or lastly, entry *claiming all expressly*, which cannot *dispossess* her fellow, for her possession is *over all lawful*, as well before as after such claim, so that there is no possession altered by such claim. 1 *Inst.* 243, *b.*, *note* 1, 373, *b.* In like manner the entry of one joint tenant, co-parcener or tenant in common will be sufficient to avoid the effect of a fine as to the other joint tenant, co-parcener or tenant in common. 5 *Cruise's Dig.*, *tit.* 35, *Fine*, *ch.* 14, sec. 52.

The agreement, therefore, made by Mr Stanard, on behalf of the children and heirs of John Gilpin deceased, with John Criswell, is to be considered as operating in favour of Joseph G. Partridge, the other tenant in common of the land, *according to his right*, as well as the children of John Gilpin according to their respective rights, there never having been any intention manifested by them at any time that it should be otherwise. We therefore think the court below instructed the jury correctly as to the second question ; and that the jury, from the evidence and the instruction of the court, were right in finding a verdict in favour of the plaintiffs below generally for the whole of the land.

Judgment affirmed.