## Leeds *against* Bender.

6ws315
f197 351

The report of an auditor appointed to distribute monies raised by a sheriff's sale of real estate is not evidence in a subsequent ejectment for the land brought by the sheriff's vendee.

Such auditor can in no case set aside a judgment of a court brought before him. He must either allow its amount according to its date, or suspend his decision till its validity is decided.

A person in possession of land and continuing so for 21 years, claiming it as his own, is within the prohibition of the limitation Act as well against a claim never made or heard of, as against a claimant with whom there is a dispute.

ERROR to the District Court for the city and county of *Phila-*

*delphia,* in an ejectment brought by Charles W. Bender against Ann Leeds for a house and lot in Duke street between Front and Second streets, in which the plaintiff below recovered a verdict and judgment. The facts sufficiently appear in the opinion of this court.

*H. Hubbell,* for the plaintiff in error.
*H. M. Phillips* and *Clarkson*, contra.

The opinion of the Court was delivered by

Huston, J.—This case, which was an ejectment by Charles W. Bender against Ann Leeds for a house and lot particularly described in the writ, was either brought before the District Court in an unusual manner, or, what appeared in that court is brought here in a very defective manner, and perhaps this latter is the case. The paper-book states that the plaintiff commenced his case by making out his title, having given in evidence a mortgage from Walters to Knight, 1819; *scire facias* Knight v. Walters, of Dec. term 1839; *levari facias* to March 1840; *alias levari facias* to June 1840, and the return; deed-poll, Fitler (sheriff) to Bender. There was contradiction between the counsel, as to whether any deed or title to Walters, or other title in him was shown, except what came out incidentally from witnesses: and it does not appear whether any of them had seen any deed to him. This objection does not seem to have been made at the trial in the District Court. The case there seems to have been put on other grounds.

I cannot find from the paper-book whether the proceedings before an auditor appointed to appropriate or apportion the money produced by the sheriff's sale, were introduced by the plaintiff immediately after what is stated above, or whether it was offered and received after the defendants had given the evidence hereinafter stated; nor is it material. The reference, all the evidence given before the auditor, and his decision on that evidence, declaring a judgment in favour of Ann Leeds against Walters fraudulent and void, were all objected to, admitted and read to the jury, and would seem to have been taken as conclusive as to that part of the case; for the credibility of the witness, Walters, though contradicted by five or six witnesses, was not even alluded to as a matter for the jury, so far as we see by the abstract of the charge sent to us.

It appeared that Walters, who is near about fifty years old, was a son of Ann Leeds: that she had a daughter by Leeds, her second husband, who was examined. The paper-book does not even pretend to give the words, and hardly the substance of her testimony. She proved that Walters often got money from his mother; once when he set up a store; again at other times, and when he bought the house in question; that it was intended the deed should be

[Leeds v. Bender.]

made to his mother, Ann Leeds, who went into possession in April 1819, immediately after the purchase, and had lived in it ever since, claiming it as her own. This continued possession was proved by five witnesses, who knew her all the time. Two witnesses swore they had heard Walters say, before he bought, that he was to buy it for his mother, and after, he had bought it for his mother. The report of the auditor contained testimony to the following purport. That in the summer or autumn of 1839, William M. Kennedy, Esq. being absent, Mr Dodson attended to business for him, and Walters, who had been a client of Kennedy, called to have a bond for a large sum drawn to his mother, Mrs Leeds, with warrant to confess judgment. Mr Dodson wished to have some evidence of the debt. After some time, and more than one interview, at length he came and brought Mrs Leeds and produced as follows: his note to Ann Leeds, dated Sept. 15, 1809, for money borrowed, $750; do. October 28th 1819, do. $1000; do. Aug. 20th 1815, do. $1500; do. Feb. 28th 1819, do. $2000; do. Nov. 16th 1823, do. $992. This last stated that it was for interest on former notes to that time. The signature to all these was proved to be that of Walters. The bond was drawn dated 21st August 1839, executed in the presence of Mr Kennedy, who had returned, and judgment confessed on it the same day: and also another judgment to a beneficial society.

This Mr James C. Walters was then called and sworn before the auditor. " This bond was executed by me. I never received any consideration for it, and do not owe any money on it. I cannot answer as to the circumstances of giving it. I decline so to do, as it might criminate me. Mrs Ann Leeds is my mother. I did not owe her the money for which the bond was given." Walters was also offered in court, objected to, but admitted. His testimony was as follows. That he did not owe, nor never owed Ann Leeds one dollar: admitted that the handwriting to the bond and power to confess judgment was his; and stated that he had done it to save something from his creditors. He also swore he did not buy the property in dispute with his mother's money, and that the deed was not intended to be made out in her name at the time of the purchase; although he admitted that he bought it that she might have a home as long as she lived, and that he had never demanded or received any rent from her during the time she had possession, 23 years from April 1819. He was called a second time to contradict two witnesses who had been called to prove what he had said at different times. The defendant then called three other witnesses, who severally swore they had heard him say, he bought it for his mother. Rebecca Leeds had sworn that he often got money from his mother, at the time he set up a store, and at other times, and gave his notes. That he got money from her when he bought the house in question. That he said it was hers,

and he would give or pay her no more. That Mrs Leeds at one time kept a store in Front street, but not since this house was bought.

As this cause goes back, perhaps other testimony, as to what her circumstances were at one time, and what property or money he had independent of her, may be proved; and it may be a grave question what credit is to be given to a witness contradicted as to most of what he swore, and who, by his own testimony, was guilty of great dishonesty, almost forgery, in fabricating *five false* notes to defraud his creditors. There was clearly error in admitting the testimony and the decision of the auditor declaring Mrs Leeds's judgment void. It escaped the very accurate and learned Judge that this point had been decided in 2 *Watts & Serg.* 557. It is a fallacy to say counsel may always read the record of the cause; that is not true; in the same cause you can neither read the report of arbitrators nor a former verdict. But this was not the same cause, but a different one from that in which the report was made; and moreover, an arbitrator to apportion money among lien creditors, can in no case set aside a judgment of account brought before him. He must either allow it for its amount according to its date, or suspend his decision until its validity is decided on in the court in which it was entered or in some other legal way.

One thing more. The Judge correctly told the jury, that to protect the defendant, she must have held it 21 years adversely to J. C. Walters and those claiming under him; but I am not sure the jury understood what, in law, is an adverse possession. It is not necessary that there should be a claim on one side and a denial of that claim by the one in possession. It was distinctly stated by this court in *Rung* v. *Shoneberger*, and several times since, that a person in possession and continuing so 21 years claiming as his own, is completely and fully within the protection of the Act. His claim for himself is a claim adverse to all the world, and protects equally against a claim never made or heard of, as against a claimant with whom there is a dispute every day. Also there are five witnesses who swore Walters said he bought it for his mother; and after putting her in possession and leaving her 22 or more years, it would not make much difference whether it was a gift or payment of a debt. Walters himself says he bought it and put her there that she might have a home as *long as she lived*. This statute is a most important and beneficial one. It was made to protect those who had no other protection — for cases where all evidence is lost. I have attended to its operation almost half a century; and I do not know any more beneficial, and, in its general operation, more just law. It gives as perfect a title, if not a more perfect title, than any other known to our law; and, as a general rule, the cases in which it has been attempted to be avoided after

the clear lapse of 21 years, have been marked by combination of those interested, though not known to be so — by rash swearing, and sometimes direct perjury.

Judgment reversed, and a *venire de novo* awarded.