## In the matter of the Estate of J. B. & C. W. Dyott. Appeal.

2 WS 557
21 SC ˢ615ᵢ

On appeals from the decrees of the Courts of Common Pleas, for settlement of accounts of assignees, and distribution of moneys, the matter is not taken up *de novo* in the Supreme Court, but confined to the exceptions taken before auditors or before the court below.

No one is entitled to a hearing on an appeal but a party who enters an appeal.

An assignee, in order to procure bail, consented to let the trust money go into the hands of the bail, and he used it in his business; the assignee is chargeable with interest from the time the money thus passed.

The funds being partly wasted by such bail, and not forthcoming when payable over, the assignee is not allowed commissions.

*Quære?* Where a bailee or commission merchant makes an assignment for the benefit of his creditors, and the proceeds after sale are in the hands of his assignee for distribution, the principal or owner of goods thus disposed of, or his assignee under the Insolvent Act, may come in as a creditor before the auditor appointed to distribute?

It is certain, however, that where no assignment has been made under the Insolvent Act, the creditors of such principal or owner, cannot, though he may have been in prison.

An auditor appointed to distribute moneys cannot inquire into a judgment rendered in court, but must take it as conclusive. He may adjourn the case to enable a party to apply to the court to open the judgment.

THIS case came before the court by appeal from the decree of the Court of Common Pleas of the city and county of *Philadelphia,* confirming the report of auditors appointed to settle the account of Samuel Sneyd, assignee of J. B. & C. W. Dyott, under an assignment for the benefit of releasing creditors, dated the 26th of January 1839.

II. —2 w *

The auditors' report was a full one, but it is necessary only to state those parts of it which were contested on this appeal.

The auditors reported:

" That the said accounts are correctly stated and duly vouched as respects the amount of receipts and payments by the assignee.

Two exceptions were taken on the part of certain creditors to these accounts.

1st. The charge of $300 for so much paid to the appraisers of the goods assigned, was objected to on the ground of its being exorbitant and excessive.

Evidence was taken upon this point, from which it appeared that the effects assigned consisted of drugs, medicines, glass-ware, and various other articles contained in several stores or laboratories in great quantities. The appraisers were persons whose professional knowledge of the articles was necessary to a just and proper valuation of them. The time employed in the arrangement, ascertaining the amount and quality of the goods, and determining upon the valuation, was necessarily very considerable. The inventory and appraisement cover sixty-eight pages of foolscap paper.

Looking at the peculiar character of the goods assigned, and the other circumstances mentioned, we are of opinion, and so report, that the charge of the appraisers was not excessive, but fair and proper.

2d. The amount of the appraisement was $32,086.32. The amount of sales at auction was $30,576.81; being a difference of $1509.51.

It was proposed, on the part of some of the creditors, to charge the assignee with this difference, but no sufficient reason was shown for the charge. It appeared in evidence that the sale was made by the assignee as soon as it was practicable for him to do so after the appraisement; that very respectable auctioneers were employed, and every thing done that is usual for the purpose of giving notice and obtaining the best prices. We perceive no ground, therefore, for charging the assignee with more than the nett amount of the sales at auction.

3d. It was also objected that the assignee had not charged himself with the outstanding debts due to J. B. & C. W. Dyott, nor, as far as appeared, made any efforts to collect them. An account was produced from the books of the assignors, showing what debts were due to them at the time of the assignment. And the assignors themselves were examined.

Upon the whole testimony we were satisfied that the assignee was not chargeable with these debts *ex negligentia;* that of the debts actually due but few were recoverable; and as to such as may be recovered hereafter, they will be properly introduced into a supplemental account.

[In the matter of the Estate of J. B. & C. W. Dyott.]

These were all the exceptions taken to the account at the hearings before us.

We find, however, that the commissions of the assignee are charged on the gross amount of the sales, viz., $30,576.81, which we conceive to be incorrect. The usual and proper course we submit to be, to charge the commissions on the nett amount, or that which actually comes into the hands of the accountant, which in this case was $28,573.60, making the proper amount of commissions at 5 per cent. $1428.68.

With this correction we find the account to be accurate.

In the progress of the hearings before us, R. J. Arundel, Esq., attorney for several creditors of Dr Thomas W. Dyott, offered evidence to prove that the effects assigned by J. B. & C. W. Dyott to Samuel Sneyd, the assignee in this case, were not the property in point of fact of J. B. & C. W. Dyott, but belonged actually to the said Thomas W. Dyott; and he contended that the auditors had a right to receive this evidence, and if satisfied that the goods were really the property of Thomas W. Dyott, and not of J. B. & C. W. Dyott, that they had also the right to appropriate the fund in the hands of the assignee to the payment of the creditors of Thomas W. Dyott. We were satisfied, however, that we had no such right. We are of opinion that our duty and power are confined to the settlement of the accounts of this assignee, and the distribution of the fund, as the property of J. B. & C. W. Dyott, among their creditors, according to the terms of their assignment; and that we had no jurisdiction whatever to determine the question of the property in the goods themselves. If the goods really belonged to Thomas W. Dyott, the property in them is not changed by the sale made under the authority of the assignee of J. B. & C. W. Dyott, and the creditors of Thomas W. Dyott may levy an execution upon them. We are to take it for granted in the present case that the fund to be distributed by us arose from the sale of the property of J. B. & C. W. Dyott. At all events, their right, title, and interest in these goods were sold, and if they brought the full value of the absolute property in the goods, the creditors of J. B. & C. W. Dyott, it appears to us, are alone entitled to the fund.

For these reasons it appeared to us that we ought not to receive the evidence offered, and it was accordingly rejected; but in compliance with the request of the counsel, the offer is here stated.

The account as corrected in respect to commissions, will stand thus —

| | | | |
|---|---|---|---:|
| Amount *received* by the assignee per account, | . . | | $28,573 60 |
| Amount *paid* by assignee per account, | . | $2,373 05 | |
| Commissions, . . . . . . . . . . | | 1,428 68 | |
| Prothonotary for advertising, | . . . . . | 13 40 | |
| | | | 3,815 13 |
| Balance, | . . . . . | | 24,758 47 |

[In the matter of the Estate of J. B. & C. W. Dyott.]

From which are now to be deducted, fee to H. Chester,
  Esq., for professional services to assignee, &c.  $100

| | | | |
|---|---|---|---|
| Dr.     Brought over, . . . . . . . . . . . | | | $24,758 47 |
| Cr.     Brought over, . . . . . . | $100 | | |
| Copy of account, . . . . . . . . . | 14 75 | | |
| Certificate of auditors' appointment, . . | 0 50 | | |
| Auditors' fees, &c., . . . . . . . . | 300 00 | | |
| Advertising, . . . . . . . . . . . | 5 00 | | |
| Affidavits, . . . . . . . . . . . | 75 | | |
| Thomas Evans for·room, . . . . . | 15 00 | | |
| | | | 436 00 |

Balance, . . . . . . .  $24,322 47

From this balance of $24,322.47 is yet to be deducted the
amount due by the assignee for rent of the warehouses and other
buildings occupied by him for the purposes of the assignment after
the commencement and until the conclusion of the trust.

The auditors then allowed certain claims for rent, and sum up
the assets as follows:

From the foregoing balance in the hands of the
  assignee of . . . . . . . . . . . . . . . .  $24,322.47
If the above claims for rent be deducted, . . . .      898.38

There will remain for distribution among the credit-
  ors of the assignor, . . . . . . . . . . .  $23,424.09

They then consider the claims of certain creditors against the
fund, till they come to the sixth item, as follows:

6. Holmes and Porter claimed the amount of a judgment
against J. B. & C. W. Dyott, entered on the 18th of January
1839, in the District Court for the city and county of Philadelphia,
by virtue of a warrant of attorney, accompanying a bond exe-
cuted by the defendants in the penal sum of $50,000, with condi-
tion for the payment of $25,000 on demand.

The counsel of some of the creditors objected to the admission
of this claim as a debt entitled to payment out of this fund, at
least to the extent claimed; and offered evidence to prove that,
on the hearing in the Insolvent Court of the application of Thomas
W. Dyott, for his discharge, Addison Porter, one of the obligees
in the bond, and one of the plaintiffs in the judgment, testified
that they held a bond of Thomas W. Dyott, for $25,000; and,
as collateral to that, a bond of J. B. & C. W. Dyott for $25,000; that
they had no particular inducement for taking the bond of J. B. &
C. W. Dyott, but that they had exchanged checks with them for
about $3000; and that he did not aver, at the time of the exami-
nation, that they owed him any thing; and alleged no other claim
than what might arise from the exchange of the said checks.

We were of opinion, however, that we had no right to inquire

[In the matter of the Estate of J. B. & C. W. Dyott.]

into the judgment of the District Court. We conceived that we were bound to receive and treat the judgment certified to us as a valid and conclusive judgment for the amount for which it was entered, and that whatever might be the evidence given, it could not have the effect of impeaching the judgment, or reducing its amount. We therefore declined hearing any testimony upon this point; but we offered to adjourn the case for a sufficient time, to enable the counsel to apply to the District Court to open the judgment. In the absence of any authoritative impeachment or avoidance of this judgment, we report that the plaintiffs are entitled as creditors, to the full amount above stated.

They then proceed with the claims of other creditors not material, and conclude:

These were all the claims presented to us of creditors entitled by release to come in under the assignment. It appeared by the release produced, that two other persons had executed the instrument, as creditors, whose claims were not presented before us, viz.: Abraham Shantz and Daniel Estill. Besides the public notice already mentioned, we directed personal notice to be given, if practicable, to these individuals.

The following items, extracted from the assignment account, are added to the report:

| | | |
|---|---|---|
| Amount received for sales, . . . | $28,549.10 | |
| 1 Lot drugs, . . . . . . . | $20.00 ⎱ 24.50 | |
| 1 do. do. . . . . . . . . | 4.50 ⎰ | |
| Amount paid . . . . . . . . . . . . . . | | $2,363.05 |
| Paid S. J. Curtis's bill, . . . . . . . . . . | | 10.00 |
| Commissions, 5 per cent., on gross sales, ⎱ $30,576.81 ⎰ . . | | 1,528.84 |
| Paid prothonotary for filing and advertising account, | | 13.40 |
| Amount of inventory and appraisement of the estate of J. B. & C. W. Dyott, as filed, . - - . . . . . | | $32,086.32 |

The following affidavit of B. W. Richards was taken upon the appeal:

Benjamin W. Richards, a witness on the part of the appellant, being duly affirmed, doth declare and affirm as follows: I am president of the Girard Life Insurance Annuity and Trust Company. I know that that company acts as trustee for the estate of J. B. & C. W. Dyott, successors to Samuel S. Sneyd, original assignee, who died. We have not yet been able, after diligent efforts, to recover the trust fund. I will give the precise amount that we have received from Addison Porter, one of the late firm of Holmes & Porter, who were sureties for the assignee, $8064. It was received at different dates, which dates I have not now, but will annex them to this deposition. I understand that Holmes & Porter were the sureties of Samuel Sneyd, the assignee, and that the funds belonging to the estate passed into their hands. I

[In the matter of the Estate of J. B. & C. W. Dyott.]

know the fact that they were paid the amount of sales, made on account of the estate by Richards & Bispham, which was $28,549.10. I am unable to say whether that is the exact amount, but I believe it is; I know the fact from being one of the firm of Richards & Bispham. The whole proceeds of the sales of the estate of J. B. & C. W. Dyott, made by Richards & Bispham, was paid over to Addison Porter, of the firm of Holmes & Porter. Mr Porter stated to us that the firm of Holmes & Porter were the sureties of S. Sneyd, and he gave us an order from Mr Sneyd, the assignee, to pay over to him (Porter) the amount of sales.

We had required such authority before we paid over the amount of sales, and we took receipts for it in the name of the firm of Holmes & Porter. They were brokers in Third Street near to Market. I should say they were exchange brokers. I have had repeated conversations within a year with Mr Porter, touching the payment of the sums due to this estate. He has stated to me that these funds have become involved in their business, and were locked up, so that they could not pay them over unless time was allowed them. He stated to me that he had a claim upon Dyott's estate. He has shown on all occasions a disposition to pay this money, and has left one or two notes of other parties, which have not yet been paid, and are not returned as part of the fund in the hands of the Trust Company. I recollect but one of these notes at present, which I think is for $900; but its payment I think uncertain. He gave us a ground-rent, which has been sold, and is credited in the amount stated. I pressed him as far as I could with propriety press anybody. Mr Holmes, the partner of Mr Porter, died in September 1840. I think our counsel advised us, as he has been consulted throughout the matter, to bring no suit until the Supreme Court has decided this question. I understand Mr Holmes's estate is ample, and I have also given Mrs. Holmes the notice that the estate would be held responsible.

*Receipts by the Girard Trust Company from A. Porter.*

| | | | |
|---|---|---|---|
| October 23d 1840, | Cash, | . . . . . . . . . | $2000.00 |
| November 3d 1840, | " | . . . . . . . . . | 2000.00 |
| November 10th 1840, | " | . . . . . . . . . | 1000.00 |
| March 8th 1841, | " | . . . . . . . . . | 980.44 |
| May 18th 1841, | " | . . . . . . . . . | 1736.32 |
| June 25th 1841, | " | . . . . . . . . . | 350.00 |
| | | | $8066.76 |

The following exceptions were taken, among others, to the report of auditors:

Because the auditors erred in refusing to consider the question of property in T. W. Dyott's estate, and not awarding the fund to the estate of M. B. & T. W. Dyott.

[In the matter of the Estate of J. B. & C. W. Dyott.]

Because the auditors erred in allowing the claim of Holmes & Porter.

Because the auditors erred in not charging the accountant with interest.

That the allowance of five per cent. commission to the assignee should be reduced so much as the present trustee shall have the right to charge, so that there shall not be double commissions charged.

*Hirst,* for the creditors of M. B. & T. W. Dyott, insisted that the auditors should have allowed the evidence that the property assigned belonged to the estate of M. B. & T. W. Dyott. The assignors were only the bailees or factors of Dr Dyott, and as he made no assignment, and did not claim, his creditors could. It is a settled rule that the principal may follow his property or its proceeds into the hands of the agent. *Story on Agency* 225, 230 ; *Story's Bailment* 151 ; 2 *Kent's Com.* 644 ; *Jones on Bailment* 85. Bankruptcy of the bailee is a revocation of the trust, and the right of property reverts. An agent is like an executor — he can only pass the title he possessed. We could have shown that the goods consisted of drugs and glass-ware, manufactured by T. W. & M. B. Dyott, and sent to the shop of J. B. & C. W. Dyott for sale on commission, and that advances were made on the goods by them. Another portion came to their hands by tort. Even if all this was collusive, yet they held in trust for T. W. & M. B. Dyott's creditors.

He also claimed interest against the assignee by reason of his having used the funds, or permitted his sureties to do it, citing *Lewin on Trusts* 328 ; 1 *Binn.* 199 ; 4 *Serg. & Rawle* 115 ; 1 *Johns. Chan.* 620 ; *Devereux* 369 ; 1 *Edwards* 128.

The commission is wrong. None ought to be allowed ; or, at any rate, the commission for the new trustees of the Girard Trust Company should be deducted.

*Meredith* and *Randall,* for Ridgway ; and *Wheeler,* for Mann, *contra.* The broad question is, whether a stranger can come in under a distribution of assets of an insolvent, and claim them. The Act of 14th June 1836, sections 7 and 9, regulates this, and provides only for the settlement of the trust estate. The assignee might claim a suspension of the distribution till the suits were determined, but a stranger must proceed adversely against the assignee, and claim not out of the fund, but in opposition to it. The assignee sells only the right of the assignor, and does not warrant the title. There was certainly something valuable in the hands of the assignee, consisting of all the rights and title of the assignor ; and that was what he sold, and all that was to be distributed.

[In the matter of the Estate of J. B. and C. W. Dyott.]

*Chester,* for Sneyd, the assignee, urged that unexampled efforts were made by the assignee to settle a most difficult and complicated business. It was long before the money was received, and there was no duty on him to invest it. The sales were at six months' credit. When a new trustee was appointed, 10th October 1840, it was the duty of the assignee, or his sureties, to pay over. From that time, I admit, it was reasonable he should be charged with interest; but before that there was no default.

*Austin,* in reply, contended that commissions ought not to be allowed, and that the assignee ought to be charged with interest. The funds were placed in the hands of brokers (who became sureties for the assignee), and locked up in unavailable stocks. The assignee is not to be allowed to purchase sureties at the expense of the estate. An administrator who acts unfaithfully is not entitled to charge a commission. 4 *Watts* 77.

He further contended that the consignor may follow the thing or its proceeds, where it can be distinguished. 2 *Dall.* 60 ; 1 *Yeates* 540 ; 2 *Kent's Com.* 623 ; *Story's Agency* 224, *sections* 229, 230, 231 ; unless where it is transferred *bonâ fide* to a purchaser. He stated that the appellants claimed as creditors of Dr Dyott, in his right, and as having a prior right to this fund — creditors who have not released J. B. & C. W. Dyott.

The opinion of the Court was delivered by

ROGERS, J.—It has been repeatedly held, as is seen in *Hise's Estate,* (5 *Watts* 157), that the Supreme Court takes cognizance of appeals from the Orphans' Court as an appellate court strictly. This is the general rule ; although as respects that court, and that court alone, it has been modified by the Act of the 14th April 1835, which enables the Supreme Court to hear and determine the same as to right and justice may belong, and vests a power in them to refer the case to auditors, when in their discretion they may think proper. The rule is at least as applicable to appeals from the Court of Common Pleas, in the distribution of money arising on sheriffs' sales, as to decrees of the Orphans' Court. The nature of an appellate court is to correct the errors of inferior tribunals ; who are supposed to examine the case thoroughly, and who cannot, with propriety, be said to have erred, where the mistake has arisen from any cause to which their attention has not been called. We cannot examine the case *de novo,* without overwhelming the court with business ; and, in many cases, unless this be done, and the cause be reheard *in toto,* we run the risk of doing more injustice than we prevent, by determining a cause on an apparent state of facts, which the opposite party has no opportunity to explain or rebut. In the case in hand, it does not appear, but the reverse, that any exception was taken before the auditors to the interest account, or the commissions. After

stating the exceptions, in which neither the interest nor commission are mentioned, the auditors say; " these were all the exceptions taken to the accounts, at the hearing before us." They then add ; " we find, however, that the commissions of the assignee are charged on the gross amount of sales, viz. $30,576.81, which we conceive to be incorrect. The usual and proper course, we submit to be, to charge the commissions on the nett amount, or that which actually comes into the hands of the accountant." And that is true; but it presents a very different question from the one which has been submitted to us. It appears, therefore, negatively on the face of the report, that these exceptions were not taken at the hearing before the auditors. But although not taken, both points were made at the hearing in the court, who, on an examination, decided in favour of the accountant. I have inquired into the practice of that court, and find that the practice is to allow exceptions, although not taken before the auditor : in many cases this would be necessary to prevent injustice. The court may determine the point either on the evidence returned by the auditors, may hear other testimony, or may remand the case to the auditors, with proper directions, as they may deem right. Under the circumstances, then, the case is open for examination here on the exceptions taken in court : they are, that the auditors erred in not charging the accountant with interest, as to the allowance of five per cent. commissions to the assignee; and because the auditors erred in refusing to consider the question of property in T. W. Dyott's estate.

If executors, administrators, or trustees, through negligence, suffer money to remain unemployed, they are responsible for interest; much more, if they use the money for their own purposes. They are not allowed to make any gain, profit, or advantage from the use of the trust funds. If they convert the trust moneys to their own use, or employ them in their business or trade, they are chargeable with *compound* interest. And the *cestui que trust* may elect to take either the profits made by the money, or interest. *Fox* v. *Wilcocks*, (1 *Binn.* 199; 1 *Johns. Ch.* 629); *Lewin on Trusts* 328; 24 *Law Lib.* It is an incontrovertible rule, that where a trustee receives interest, or suffers others, who act as his agents or in his stead, to receive interest, they must pay interest. The assignee Sneyd, it seems, being unable to obtain security for the faithful discharge of the trust, agreed with Holmes & Porter, who were exchange brokers, that, on condition they would become his sureties, he would allow the proceeds of the estate to be paid to them. According to this arrangement, and on an order from the assignee, Richards & Bispham, who sold the goods, paid to Holmes & Porter the amount of sales, $28,549$\frac{10}{100}$. And this large amount of money, instead of being applied to the faithful execution of the trust, has been suffered to remain in their hands, and has, as was to be expected, been used in their business. Since the death of the assignee, the

[In the matter of the Estate of J. B. & C. W. Dyott.]

Girard Life Insurance Annuity and Trust Company has been substituted in his place, and with every exertion they have been able to obtain the payment at different times of only the comparatively small sum of $8064. The arrangement made by Sneyd with Holmes & Porter, was for his own convenience and benefit. To procure bail, he consents to make them his agents, and he must be responsible for their acts. It is said the arrangement was a proper one; be it so; but that does not exempt the assignee from responsibility for their misconduct. He must look to them for indemnity, if they have abused his confidence. It is very plain that the creditors are entitled to interest, because the money has been used; and to whom are they to look, except to the person who undertook to discharge the duties of an assignee with fidelity, and to his sureties, who are the same persons who have had the use of the money? Sneyd has identified himself with Holmes & Porter. Their acts are his acts. We are of opinion that the assignee is chargeable with interest from the time the money was paid into the hands of Holmes & Porter; for from that time it is fair to presume they intermixed it with their own funds. It also results from the statement of the facts as above, that the assignee has not entitled himself to commissions. Commissions cannot be allowed to a person who has been guilty of fraud; nor is he entitled to any compensation when he has wasted, or suffered others to waste and mismanage the estate. Trustees, assignees, &c., should receive a liberal compensation for their services; but, at the same time, they should be held to a strict accountability for their conduct. Here it is manifest that the creditors, instead of being benefited by the assignee, have been materially injured by the mismanagement, calling it by its mildest name, of the assignee or his agents.

This opinion is founded on the assumption, that the facts stated are true, but they appear in a deposition of Mr Richards, which was taken on a rule after the cause was removed to this court; but as we can hear the cause only on the testimony taken in the Court of Common Pleas, it is not legally before us. Enough, however, appears on the face of the report, to convince us that the justice of the case requires that it should be re-examined as to the parts indicated. The auditor states in his report, that the assignee received $28,573.60; none of which, does it appear, was ever paid over to the creditors, and only $8064 to the subsequent assignee. According to the principles stated above, he is liable to interest, whether the fund remained unemployed in his hands, or was used for his own purposes. Sufficient appears in the evidence to make it his duty to give some account of the management of the fund.

The next exception is, that the auditors declined hearing evidence to prove that the effects assigned by J. B. & C. W. Dyott to Samuel Sneyd, for the benefit of creditors, were not the property

[In the matter of the Estate of J. B. & C. W. Dyott.]

of creditors, in point of fact, of **J. B. & C. W. Dyott**, but belonged actually to Thomas W. Dyott. Without touching the abstract question, whether such testimony may not be admitted before auditors, when the claimant consents to come against the fund as a creditor for money had and received; or where goods sold were in the custody of the assignor as a banker or commission merchant, and were transferred to his assignees for the benefit of his creditors; yet we think it plain, that the general creditors of T. W. Dyott had no right to be heard before the auditors. If T. W. Dyott had taken the benefit of the Act, or had made a voluntary assignment for the benefit of creditors, there would have been such a fixed and certain interest in the assignees, as to enable those acting in behalf of his creditors, to avoid the assignment as fraudulent, or to assert a right to the property as his; or if he had been dead, according to the case of *Buehler* v. *Gloninger*, (2 *Watts* 226), and *Stewart* v. *Kearney*, (6 *Watts* 454), his personal representatives or trustees for the creditors, or, in the latter case, for the benefit of his estate, would have been competent to make the exception. But beyond the instances put, we have never gone; and we can perceive no right in any person, by merely representing himself to be a creditor, to interpose a claim to the property in the behalf of the debtor. If T. W. Dyott had not been placed in a peculiar situation, no person would doubt the application of this principle. But we conceive that his unfortunate position cannot alter the case, as he has not lost the right to control his own funds, or to protect exclusively his pecuniary interests.

We agree that the auditors had no right to inquire into the judgment of the District Court. They are bound to treat the judgment as a valid and conclusive judgment, and all they could do, was to adjourn the case, which was done, for a sufficient time to enable the counsel to apply to the court to open the judgment. The auditors, however, would not be precluded from receiving testimony to show that since its rendition, the judgment has been paid, or otherwise satisfied. It has also been repeatedly ruled that no person is entitled to be heard in the court, unless he enters an appeal from the decree of the court.

Decree reversed, so far as respects the interest and commission, and the cause remanded to the Court of Common Pleas for further hearing.