## Hess's Estate.

1. An assignee, a member of a private banking firm, mixed the trust moneys with his own, depositing them in his own name with his banking-house and received interest on the deposit. *Held,* that he was liable to the estate for interest.

2. An assignee, a member of a private banking firm, deposited the trust funds with his firm in his name *as assignee* distinct from his own. The firm sometimes paid interest on deposits, he received no interest for this deposit. *Held,* under the circumstances, he was not chargeable with interest.

3. An assignee is not bound to invest the trust fund.

4. The fact that he as one of the firm would receive profit from deposits generally, would not make him liable for interest on this fund.

* See also Rohrer's Appeal, 12 P. F. Smith 498.—REP.

[Hess's Estate.]

May 5th 1871.   Before Thompson, C. J., Agnew and Shars-
wood, JJ.

Appeal from the Court of Common Pleas of *Lancaster county* :
Of May Term 1871, No. 77.

In the distribution of the assigned estate of Samuel Hess.

On the 27th of February 1869, Samuel Hess made an assign-
ment for the benefit of creditors to Robert A. Evans and George
K. Reed.   At the time of the assignment, and up to the settle-
ment of their account, Mr. Evans was a member of the banking
firm of Evans, McEvoy & Co., and Mr. Reed a member of the
banking firm of Reed, McGrann & Co.

They filed their account, May 17th 1870 ; it showed a balance
of $34,527.73 for distribution amongst the creditors, the estate
being insolvent.

Exceptions were filed to the account, and auditors were ap-
pointed to pass on the exceptions and report distribution.

In their report they stated the amount and dates of the receipts
by Mr. Evans, and proceeded : * * *

"It will be perceived, therefore, that from a very early period
in the existence of the trust, there were in his hands large sums
of money, not needed, for any immediate exigency of the trust as
to the disposition of which his statement is as follows : 'I kept no
account with Samuel Hess's assigned estate of what I did with the
money I collected.   These moneys were not kept separate from
my own money.   I put the money, as I received it, into my pocket
with my own money.   I carried it round until it suited me to
deposit it.   When I deposited I did so in my own name.   I kept
my account in that way.   If I had any of that money it went
along with my own.   I deposited the money with Evans, McEvoy
& Co.'   He says further : 'I used it (the money of the Hess
estate) for family expenses, improving my farm, and whatever I
wished.   I had given security for it, that it would be forthcoming
when wanted in the settlement of the estate.'   In answer to the
question, 'Had any of the creditors of Hess's estate the use or
benefit of any of the estate moneys, other than those you made
payments to according to your account ?' he says : 'I do not know.
I was a creditor.   I had some of it.'   In answer to the question,
'Did you, in the use of the moneys you received from Hess's
estate or other sources, make any discrimination when you came
to pay out money for any purpose ?' he says : 'I generally paid
out the Hess money.'

"From the books of the firm it appears that Mr. Evans during
all the time that this estate was in process of settlement had depo-
sits with Evans, McEvoy & Co., varying in amount from $72,000
to $84,000.   On these deposits he had an arrangement to receive
interest, but at what rate he refuses to say.

"Mr. Reed's cash receipts up to April 5th 1869, were $2513.33 ;

[Hess's Estate.]

on the 17th of April 1869, they amounted to $4350.25; on the
14th of May 1869, to $6240.61; on the 2d of July 1869, to
$8068.66; on the 18th of October 1869, to $9035.33; and on
the 13th of May 1870, to $9857.07. The entire amount of his
payments up to the time of the filing of the account is $822.92.
Mr. Reed, therefore, had also in his hands, from a very short time
after the assignment, large sums of money, which could not be
required for any purpose of the trust, until a distribution among
creditors came to be made. As to the disposal of the sums, in the
mean time, his statement is as follows:—

" ' Those moneys (of Hess's Estate) were deposited with Reed,
McGrann & Co., as received, and went into the general fund of
the institution along with the other deposits.' To the question,
' At what rate of interest?' he answers, ' At no rate of interest at
all. I can give no reason why, except that I expected the firm to
have the use of the money. The firm of Reed, McGrann & Co.
were creditors of Hess's estate to about $2800. These moneys
were not kept separate; they were kept like other moneys, and
used like other deposits. My account was opened as George K.
Reed, assignee of Samuel Hess. I am one of the members of the
firm of Reed, McGrann & Co., and was one before the assignment.'

" It is stated by each of these accountants to be the practice of
the firm, with which he is connected, not to pay interest on depo-
sits except when provision is made for it by contract with the
depositor." * * *

After discussing numerous authorities and commenting on the
facts, the auditors reported as to Mr. Evans:—

" Under these authorities it will be a plain duty of the auditors
to charge Mr. Evans, at least, with interest at the legal rate upon
the money of the trust in his hand. He will therefore be charged
with interest at the rate of 6 per cent. per annum upon the funds
of the trust in his hands; and in calculating it the course adopted
will be, to take his statement of cash receipts, and upon each
sum therein specified—after deducting previous disbursements on
account of the trust and the usual commissions allowed to trustees
—charge interest from a period of ten days subsequent to the
date of the receipt of that sum, up to the filing of this report.

" In the case of Mr. Reed, the liability for interest is, perhaps,
not so obvious as is that of his co-trustee. In determining as to
the applicability of the exception to him, it will, therefore, not be
amiss to make a somewhat more minute examination of principles
and authorities than was requisite with Mr. Evans." * * *

" These accountants, as trustees merely for collection and dis-
bursement in view of the speedy settlement of the estate, were,
perhaps, not bound to obtain interest on the funds belonging to it;
but familiar as they were with the uses of money, and the modes
in which it might be made productive, it will hardly be doubted,

[Hess's Estate.]

that, if the balance of the trust fund in their hands had been their own individually, they would not have failed to secure upon them, at least, the rate of interest allowed by the firms with which they were connected, upon running accounts where such an allowance is agreed upon with the depositor. They, therefore, can scarcely be regarded as having exercised such care and diligence in the management of the trust funds as they would have exercised if these funds had been their own; and whether the cestuis que trust have or have not a right to complain of them on that account, it is, at all events, quite clear that the settlement of the estate as shown by the account is less favorable to the creditors than it would have been, if, ignoring all thought of personal profit or advantages, they had given to their cestuis que trust the full benefit of the very considerable skill and activity in business which they unquestionably possess. * * * In the opinion of the auditors therefore this exception must be sustained as to Mr. Reed, and he will be charged with interest at the legal rate upon the moneys of the trust deposited by him with Reed, McGrann & Co. In his account with the bank appear a great many sums—often of small amount—deposited apparently as they were received by him from those indebted to the estate. In calculating the interest, the mode of proceeding adopted will be, to take the aggregate of the deposits of each month, and after deducting therefrom all payments made during the month on account of the trust, and also the regular commissions of the accountant upon each aggregate, charge interest on each balance thus ascertained, from the close of the month to the date of the filing of this report."

The auditors therefore surcharged the account with $873.48 interest due by Evans and $631.86 due by Reed.

The assignees excepted to the report; the exceptions were overruled, and the report confirmed by the Court of Common Pleas.

The decree of confirmation was assigned for error on appeal by the assignees to the Supreme Court.

*J. Landis* for Evans, *O. J. Dickey* and *Franklin* for Reed, appellants.

*H. M. North* and *N. Ellmaker*, for appellees, cited Docker *v.* Somes, 2 Mylne & Keene 655; Jones *v.* Foxal, 15 Beavan 392; McDonald *v.* Richardson, 5 Jurist (N. S.) 9 V. C. Stuart; Freeman *v.* Fairlee, 3 Merivale 25; Townsend *v.* Townsend, 1 Giff. 201; Bowes *v.* City of Toronto, 11 Moore, P. C. C. 463, 2 Williams on Executors, 5th ed., 1624–5; Lewin on Trusts 360–1; Robinson *v.* Robinson, 9 Eng. Law and Eq. R. 75; Snell's Principles of Equity 118, 128; Adams's Equity, 5th American ed. 157; Irwin's Appeal, 11 Casey 294; Fisk *v.* Sarber, 6 W. & S. 31; Saeger *v.* Wilson, 4 Id. 502; Light's Appeal, 12 Harris 180;

[Hess's Estate.]

Bile's Appeal, Id. 335; Lane's Appeal, Id. 487; Fox *v.* Wilcocks, 1 Binney 194; Say *v.* Barnes, 4 S. & R. 112; Robinett's Appeal, 12 Casey 174; Oliver *v.* Piatt, 3 Howard 333; Wistar's Appeal, 4 P. F. Smith 60; Lukens's Appeal, 7 W. & S. 48; Hughes's Minor's Appeal, 3 P. F. Smith 500; Verner's Estate, 6 Watts 250; Dyott's Appeal, 2 W. & S. 557.

The opinion of the court was delivered, May 15th 1871, by

SHARSWOOD, J.—The exception by Robert A. Evans to the report of the auditors, charging him with interest, was rightly dismissed. He had mixed the trust-moneys of the assigned estate in his hands with his own, depositing them in his own name with the banking-house of Evans, McEvoy & Co., of which he was a member, and upon this deposit he admitted that he received interest, though at what rate he declined to say. All the authorities agree that in such a case the trustee is chargeable with interest: Verner's Estate, 6 Watts 251; Dyott's Appeal, 2 W. & S. 565; Robinett's Appeal, 12 Casey 174; Wistar's Appeal, 4 P. F. Smith 60.

The case of George K. Reed, the other assignee, is different. He did not mix the trust funds with his own. He deposited them in a separate account in his name as assignee. He received no interest upon them. Upon his own private account with the same bankers he received no interest. The presumption, at least in the absence of evidence to the contrary, is so, for deposits for safe keeping do not bear interest without a special agreement. Nor was he bound in an estate of this character—when he had a year to settle—and where the estate was in his hands for distribution merely, to invest the proceeds. Had this deposit been made in a banking-house in established credit in which he was not himself interested, it is not pretended that he would have been properly chargeable with interest which he had not received.

It is contended, however, and this contention prevailed with the auditors and the learned court below, that because George K. Reed was a member of the banking-house of Reed, McGrann & Co., with whom these deposits were made, that fact is sufficient to fix upon him this liability. This is pushing the doctrine, as it appears to us, to a very extravagent length, not sustained by any of the authorities which were cited and relied on by the learned auditors nor in the argument at the bar. It may be admitted that banks do employ a certain portion of their deposits in the discount of negotiable paper. They do that upon a calculation that such a proportion will not be called for. This proportion must vary from time to time, depending very much upon the state of credit and confidence in the community. When the deposits are large and are left for any certain period, they often agree to pay interest to their depositors, at rates varying according to the circumstances

[Hess's Estate.]

of each particular case. It is admitted that the agreement is generally special with each depositor. The saving fund institutions, which do not bank, but invest the money of their depositors in bonds, mortgages and other permanent securities, generally, I believe, stipulate that a certain notice shall be given before the money can be drawn out, or if it is liable to draft at any time the rate of interest is small. Certainly the custom of banks to pay interest to their depositors is of recent introduction. Now the principle maintained, and upon which alone the decree as to George K. Reed can be supported, is that no matter what his interest in the firm was—no matter what proportion of their deposits they kept on hand to meet the checks of their depositors—or what the actual profit made—the trustee must be answerable for interest at six per cent. The rule indeed is one of policy—to enforce the great principle that a trustee shall not be permitted to derive any benefit, direct or indirect, from the trust estate. But we ought not to carry this principle to an extent which will produce inconvenience and injustice. If the ground here taken be true it will preclude a trustee from making his deposits as trustee in an incorporated bank of which he is a stockholder. It surely should be competent for the trustee, in every case in which he is charged with interest on this ground, to show what profit he actually did make. The proportion of such profits coming to him as the stockholder of an incorporated bank or the member of a private banking-house, would perhaps be inappreciably small, unless indeed the amount of the deposits was extraordinarily large. Every case of this character must necessarily depend upon its own peculiar circumstances. We do not say that there may not be cases in which the charge of interest at some rate would not be eminently proper. The only hesitation we have had in this instance is in considering the question whether George K. Reed ought not to be charged with some rate less than six per cent. Yet without knowing what was the extent of his interest in the firm of Reed, McGrann & Co., or what the rate of profits they divided, or what was the proportion of those profits derived from that part of their deposits which they used in their business, how can this be determined? It may be that upon such a calculation it would be found that the proportion of the $631.86 lawful interest charged against Mr. Reed actually coming to him from the profits of his banking-house derived from them would be a very small sum. It will be observed that Mr. Reed's receipts were not so large as to require the application of so rigid a rule. His cash receipts up to April 5th 1869 were $2513.33; up to April 17th 1869 $4350.25; 14th May 1869 $6240.61; July 2d 1869 $8068.66; Oct. 18th 1869 $9035.33; May 13th 1870 $9557.07. The assignment was dated February 27th 1869, and the account of the assignees was filed May 17th 1870, not quite fifteen months after the assignment. Taking all

[Hess's Estate.]

these circumstances into consideration, we think that it would be unjust to Mr. Reed to allow this surcharge of interest against him to stand, and that no rule of equity or consideration of policy requires it.

Decree affirmed as to Robert A. Evans, and reversed as to George K. Reed—the costs of the appeals to be paid by the appellants, in the proportion of two-thirds by Evans and one-third by Reed.