## Verner's Estate.

If executors within the first year of their administration, convert a funded estate into cash, to an amount more than sufficient to pay all debts, and before the legacies become payable, they will be charged with interest upon the money, in favour of residuary legatees.

Executors will not be permitted, under any circumstances, to make profit for themselves out of the funds of the estate in their hands.

Although an extensive discretion is allowed to executors in the settlement of cl ims against the estate, yet the orphans' court will not dispense with the exhibition by them of proper vouchers for payments made.

An executor, who receives money of the estate, and pays it over to a co-executor, who afterwards becomes insolvent, is not chargeable with it in favour of legatees, although he would be in favour of creditors.

APPEAL by the executors of Benjamin Verner, from the decree of the orphans' court of Lancaster county, upon the settlement of their administration account.

The facts are sufficiently stated in the opinion of the Court, which was delivered by

Rogers, J.—This case comes up on an appeal from the decree of the orphans' court, on exceptions to the report of auditors. The decree is excepted to on several grounds.

Benjamin Verner, the testator, died on the 22d of November 1831, after having made his last will and testament, which was duly proved on the 24th of November 1831, in which he appointed the accountants, Michael Musselman, John Robinson and John T. Verner, his executors. The testator beqeaths various legacies, amounting in the whole, to 15,650 dollars, of which 1300 dollars was payable immediately, and the residue, viz: 14,350 dollars on the 22d of November 1832, one year after his death. He was indebted to various individuals in a sum, which with costs and charges, such as funeral expenses, &c., amounted to 3193 dollars 75 cents, making an immediate charge against the fund, in the hands of the executors, of 4493 dollars 75 cents. To pay this, the executors had in cash, 3566 dollars, leaving a deficiency of 927 75 cents, required for immediate use. They had in their hands, personal estate (exclusive of cash,) consisting of productive funds, such as bank stocks, bonds, and judgments, which, with the household furniture, sold for 1273 dollars 63 cents, were inventoried and appraised at 23,439 dollars 28 cents. The testator, also, by his will, directed real estate to be sold, the proceeds of which, amounted to 6809 dollars 50 cents. From this statement, it is obvious, that the exigencies of the estate, did not require an immediate sale of the productive funds of the estate; nor that the bonds and judg-

ments, which were well secured, should be at once collected; and it is difficult to believe, that if they had been acting for themselves and not as trustees, they would, under the circumstances, have pursued this course of reducing the funds to cash, to remain unproductive until the expiration of twelve months from the death of the testator. A sale of part would have answered the immediate demand, and there would have been but little risk in postponing the sale of the remainder of the stock, as it was well known, that property of that description, may be converted into cash without loss, at a short notice. The real estate was sold for 6809 dollars 50 cents, and the household property for 1273 dollars 63 cents, leaving a balance of only 6266 dollars 87 cents, which would be required to pay the legacies due, at the end of the year. But the exhibits show, that the executors, by the sale of the real estate, bank stock, household furniture, and the collection of debts, had in their hands on the 1st of April 1832, upwards of 20,000 dollars, after payment of debts and legacies then due, which were neither used nor wanted for payment of legacies, until the 22d of November 1832. It is therefore, plain, that the estate has not been managed for the interest of the residuary legatees, and that of this they have a right to complain. But it is alleged, that it was the duty of the executors to settle their accounts within one year from the time the letters of administration were granted, and that the reduction of the funds of the estate into cash, was necessary to enable them to make a final settlement with the legatees, residuary and specific, at that time; and that although the executors cannot be compelled, yet they may pay the legatees within twelve months. Pearson *v.* Pearson, 1 *Scho. & Le Froy* 10. But the appellants contend, that this was a mere pretext, and that the intention was to reduce the funds to cash, without regard to the interest of the residuary legatees, for their own use, and that the funds were used by Musselman, who was the acting executor in this matter. It is a principle of equity, which will not now admit of question, that a trustee shall not make profit of the funds for himself. Wherever, therefore, an executor uses the estate for his own purpose, equity will compel him to account for the profits, at least the amount of legal interest. These principles have been recognized in the act of the 29th of March 1832, *sect.* 8. No executors or administrators shall be liable to pay interest, but for the surplusage of the estate remaining in his hands or power, when his accounts are, or ought to be settled and adjusted in the register's office; provided, that nothing herein contained shall be construed to exempt an executor or administrator from liability to pay interest, where he may have made use of the funds of the estate for his own purposes, previously to the time when his accounts are, or ought to be settled as aforesaid. For the money, therefore, used by them, they are chargeable with interest, until the expiration of the year. But then the question recurs, did they use the fund? And in this part

[Verner's Estate.]

of the case, it is proper to observe, that the acting executor directed his own account in bank, to be closed, and a new account to be opened, mingled his own funds with the funds of the estate, and this induces the presumption, that he did use the money for his own benefit. It is the interest of executors, as well as legatees, that the accounts of the executor, as such, should be kept separate and distinct, and if an executor commingles one with the other, he renders himself liable to the presumption, that it is done to serve his own purposes. But this presumption may be rebuked. If then, the executors can show, that they have not used the fund, they may discharge themselves only from this liability, but burthen of proof is thrown on them; for, if the fact be so, it is in their power to show it by clear and indisputable proof. It is a principle well settled, that the intermediate profits within the twelve months, belong to the residuary legatees. 2 *School's Tr. Term*. The court directs the auditors to charge the accountants with interest, on the whole fund used by them until the 22d of November 1832. That at that time, they credit the accountants with 14,350 dollars, the amount of the legacies then payable; and that interest be calculated from that time, on the balance of the estate, in the hands of the executors.

The second exception has been properly abandoned, but the appellants insist on the exception to the allowance of 1356 dollars 5 cents to Joel Baker. Although we are desirous of giving an extended latitude to the discretion of the executors, in the liquidation of demands against the estate, yet we cannot understand upon what principle, the executors (who could have no personal knowledge of the transaction,) allowed claims, for which there were no vouchers. Or if there were vouchers, why it was thought proper to destroy them. The executors would seem, for reasons best known to themselves, to have put unlimited confidence in the statements of Joel Baker, for nothing, which could be regarded as evidence, would seem to have been exhibited, except a bald account amounting to about 242 dollars; the remainder of the account of 606 dollars 5 cents, was made up according to the testimony of Baker, of payments and receipts, but to whom those payments were made, or from whom the receipts taken, we have no means of information. These papers, from which alone we could be informed of the nature of the demand, were burnt by Mr. Musselman and Mr. Baker. If, therefore, the executors lose this item, it will be in consequence of their own act done, without any reason and in a manner, which to say the least of it, is not usual on the part of trustees. The book account, is the only voucher which has been shown, and although in many respects this account is exceptionable, and certainly could not have been recovered, if defence had been made, yet, as this may have arisen from an error of judgment, we are of the opinion, that it may be allowed. In addition to this, the auditors have credited the executors with 750 dol-

[Verner's Estate.]

lars, paid to Baker for two years' and a half service, as agent of the testator. We have carefully examined the testimony in relation to this charge, and when we take into view, the legacies left by the testator to Baker and his children, amounting to 600 dollars, we think 50 dollars a year, would be a most ample allowance. The court, therefore, directs the auditors, to allow the book account and the sum of 125 dollars, for the services of Baker as agent. The remainder of this credit is disallowed, and this upon the principle, that in this transaction, the executors have been guilty of gross negligence, for which they are liable to the estate.

We think that the decree of the court was correct in refusing to charge the accountants with the 1000 dollars, paid to John T. Verner, the co-executor. In Brown's Appeal, 1 *Dall.* 311, recognized in M'Near's Appeal, 4 *Rawle* 148, the principle is decided. It was there held, that when an executor, who had received money belonging to the estate of the testator, and paid it over to his co-executor, was become insolvent, he was not answerable to legatees, although, as the court say, he would have been chargeable to creditors, if there had been any. Here legatees are alone interested, and it is not pretended, that the executors had any reason at the time the payment was made, to question the solvency of the co-executors.

The court is further of the opinion, that the fee of 200 dollars, for professional services rendered in the suit of Robert T. Henry, against the executor, was improperly allowed. It was a contest between different claimants to a legacy. The legacy was payable to one or other of the parties, and as it was immaterial to the residuary legatees, to whom it was paid, it would be unjust that they should be compelled to bear the expenses of the controversy. Nor was the event of the suit of any consequence to the executors, as they were merely stockholders, and as such, not interested in the final termination of the cause.

The exception to the allowance of commission is overruled, as also, to the costs of the audit. The court is authorized to appoint auditors to settle the estate under the act of 1832. It is part of the machinery of the law, for the adjustment of the estate, and for this reason, the costs should be paid out of the whole fund. 1 *Sho. & Le Froy* 12.

The accounts are therefore remanded to the auditors, with directions to restate the account upon the principles indicated, and to report the same to this court.