---

(15 Misc. Rep. 566.)

### In re OOSTERHOUDT'S ESTATE.

(Surrogate's Court, Cattaraugus County. January, 1896.)

1. EXECUTORS—LIABILITY.

An executor is personally liable for personalty which he transfers to legatees, leaving claims against the estate unprovided for.

2. SAME—INTEREST.

Executors who transfer personalty to legatees, leaving claims against the estate unprovided for, will not be charged interest on the value thereof, they having borrowed money with which to pay debts, and not being entitled to credit for interest paid thereon, for the reason that, but for the transfer to the legatees they would not have been obliged to negotiate the loan.

3. SAME—PAYING OUTLAWED CLAIMS.

An executor who pays a claim barred by the statute cannot have credit therefor.

4. NOTES—INDORSEMENT.
   Where a person living in New York there indorses and gets discounted a note payable in Ohio, the contract of indorsement is a New York contract, and an action thereon is governed by its statute of limitations.

5. ESTOPPEL—SILENCE.
   A legatee is not estopped to make claim against the executors who pay a claim barred by the statute because, when they propose, in her presence and that of other legatees, to pay such claim, she makes no response.

6. SAME—WHO BOUND THEREBY.
   Though legatees are estopped by their acts to make a claim against executors for paying an outlawed claim, this does not prevent creditors of the estate making claim because of such payment.

Proceeding for settlement of the accounts of the surviving executors of Samuel Oosterhoudt, deceased.

James H. Waring, for executors.
O. S. Vreeland, for contestant.

DAVIE, S. Samuel Oosterhoudt died at the town of Olean November 12, 1884, leaving, him surviving, his widow, Mary H. Oosterhoudt, a son, Samuel F., and two daughters, Eva E. Smith and Mary A. Allen. His will, bearing date November 3, 1884, was admitted to probate on the 26th of the same month. The widow and the son and John B. Smith, the husband of one of the daughters, were named executors, and each duly qualified. The widow died June 10, 1890, without having participated to any great extent in the management of the estate. The testator devised certain real estate to his widow absolutely, and bequeathed to her the income of his bank stock during life. He devised to each of his children and to a granddaughter certain real estate, and bequeathed to the son and to each of his two minor grandsons 20 shares of his bank stock after the death of the widow. The balance of his estate he devised and bequeathed to his three children, share and share alike. Shortly after the probate of the will, the legatees, by mutual agreement, took possession of the various parcels of real estate devised to them respectively. There were certain liabilities existing against the testator at the time of his death, some of which were absolute, and others, by way of indorsements, contingent. In the account filed, the executors charge themselves with total receipts to the amount of $18,493.17. They credit themselves with having expended in the administration of said estate $31,930.14. They report outstanding demands against the estate exceeding $15,000.

The testator was the owner of 60 shares of the capital stock of the First National Bank of Olean, of the par value of $100 per share, but actually worth much more. No certificates for such stock had been executed or delivered to the testator, but his name was entered on the books of the bank as the owner of and entitled to such shares. Dividends were declared by the bank upon such stock from time to time, usually semiannually, and paid to the widow to the time of her death. On the 23d day of September, 1890, the officers of the bank, by direction of the surviving

executors, executed certificates for such stock directly to the legatees, that is, for 20 shares to the son and to each of the two grandsons. On October 9th following, Samuel F. Oosterhoudt sold his stock to one Dusenbury for $4,200, and on April 23, 1893, the 20 shares of stock issued to the grandson S. E. Smith were transferred by his general guardian to Dusenbury for $4,160. The only reference made by the executors to this stock in their account is that it was specifically bequeathed, and had been turned over by them to the legatees. All the other assets were disposed of by the executors, as well as the land not specifically devised, the legatees all joining in the conveyance, and the proceeds arising from the disposition thereof expended by them in the course of administration. This being the situation of the estate, it is claimed on behalf of the contestant that this bank stock should have been applied by the executors in the payment of debts, and that they were not authorized to transfer it to the legatees, although specifically bequeathed, leaving the debts unprovided for.

The rule is well settled that the personal property is the primary fund for the payment of debts. The order of marshaling assets for the payment of debts is: First, the general personal estate; second, estates specifically devised for the payment of debts; third, estates descended; and, fourth, estates specifically devised, though charged generally with the payment of debts. 1 Birdseye's Rev. St. 1131. The testator is presumed to act upon this legal rule in making a testamentary disposition of his estate until some distinct and unequivocal intention to the contrary is shown. Hoes v. Van Hosen, 1 N. Y. 120; In re Smith, 19 N. Y. St. Rep. 898. There is nothing in the express provisions of the will exonerating the bank stock from the operations of this general rule; nor does the evidence relating to the extrinsic circumstances indicate any such intent on the part of the testator. An arbitrary construction of the terms of the will so as to exonerate the personal estate specifically bequeathed from all the burdens of debts and expenses of administration, thereby charging such debts and expenses upon the real estate specifically devised, would be entirely unsustained by authority. This is not a debatable question. It has been distinctly held that personal property, although specifically bequeathed, must be applied to the payment of debts before land specifically devised can be charged therewith; and, in consequence, where an executor first applied the rents of the real estate to the payment of debts, in such a case it was held to be a misappropriation of the funds, for which the executor was held liable personally. Nagle v. McGinniss, 49 How. 193; Rogers v. Rogers, 3 Wend. 503; In re Smith, supra; Hoes v. Van Hoesen, 1 Barb. Ch. 379; Hoes v. Van Hosen, 1 N. Y. 120; Dodge v. Manning, 11 Paige, 334. This question has frequently claimed the consideration of other courts, where it has been distinctly held that even a charge of the testator's debts upon his lands generally, however formally framed, will not exonerate the personalty. White v. White, 2 Vern. 43; Bridgman v. Dove, 3 Atk. 20; Hancox v. Abbey, 11 Ves. 186; Duke of Ancaster v. Mayer, 1 Brown,

Ch. 454. The executors having made an unauthorized and improper application of this portion of the assets, they are personally liable therefor as for a devastavit. Conduct on the part of representatives amounting to devastavit is defined to be "such a mismanagement of the estate and effects of deceased in squandering and misapplying the assets contrary to the duty imposed on them for which executors and administrators shall answer out of their own pockets so far as they have had or might have had assets of deceased." Williams' Ex'rs (Eng. Ed.) 1796; 7 Am. & Eng. Enc. Law, 346, note 1. Paying debts or legacies out of order, making mispayments, paying legacies before debts, applying the assets in undue funeral expenses, delivering property to next of kin, leaving debts unpaid, are all adjudged instances of such maladministration as constitute devastavit. 7 Am. & Eng. Enc. Law, 346, note 2; Cobb v. Muzzey, 13 Gray, 58; Place v. Oldham, 10 B. Mon. 400; McNair v. Ragland, 1 Dev. Eq. 516. The responsibility for this misappropriation rests upon both of the accounting executors. Each participated in the transaction for the disposition of the bank stock. One of the executors and a minor son of each were the beneficiaries of the transaction. Moreover, the executors each join in the account, and that is an admission of joint action and joint liability. Glacius v. Fogel, 88 N. Y. 434–443. Oosterhoudt received $4,200 for his stock; Smith, as guardian, $4,160; and the stock transferred to Oosterhoudt's son was worth $4,200,—making a total amount of $12,560 with which the executors must be personally charged.

It is also claimed on the part of the contestant that the executors should be charged with interest upon the value of the bank stock from the time of its misapplication. The liability of executors and administrators for interest must depend largely upon the particular facts of each individual case. There, are, however, certain well-defined principles applicable thereto. In Dunscomb v. Dunscomb, 1 Johns. Ch. 508, it is said: "Executors and other trustees are chargeable with interest if they have made use of the money themselves, or have been negligent either in not paying over the money or in not loaning or investing it so as to render it productive." This rule has been frequently recognized and applied. Cowing v. Howard, 46 Barb. 580; Duffy v. Duncan, 32 Barb. 593. They are liable for interest on moneys of the trust fund converted to their own use. Schieffelin v. Stewart, 1 Johns. Ch. 624; Brown v. Rickets, 4 Johns. Ch. 303; Manning v. Manning's Ex'rs, 1 Johns. Ch. 535; Mumford v. Murray, 6 Johns. Ch. 1; Kellett v. Rathbun, 4 Paige, 102; De Peyster v. Clarkson, 2 Wend. 78. The law exacts fidelity of a trustee in the management of his trust. If he is guilty of fraud or mismanagement, or is guilty of a breach of trust, or has used the trust funds for his own purpose, he may be compelled to pay interest. Price v. Holman, 135 N. Y. 133, 32 N. E. 124. Executors have been charged with interest where, by their wrongful acts, as by mispayments, they have disappointed claimants (Jones v. Ward, 10 Yerg. 161); where, without reason, they have recalled funds out at interest (Verner's

Estate, 6 Watts, 250); where they unreasonably refuse or neglect to account (Gray v. Thompson, 1 Johns. Ch. 82). An application of the principles enunciated in the authorities cited to the case at bar, considering the transaction of the disposition of the bank stock independent of any other features of the case, would render the executors liable for interest to some extent upon the value of the stock; but the conclusions reached, as hereinafter set forth, regarding the executors' credits in their account for discounts paid by them indirectly reaches the same result. The executors ought not to be charged with interest, and their claim for reimbursement for discounts paid by them also disallowed. This would be subjecting them to a double penalty.

The accounting executors from time to time made their promissory notes as executors, and caused them to be discounted at the First National Bank of Olean. One of such notes, dated February 8, 1893, was for $3,265; another, dated March 19, 1893, for $1,077.63; another, dated March 9th of the same year, for $750; another, dated April 29th of the same year, for $250; and each due in three months from date. Such notes have been renewed from time to time, and are still outstanding, and held by the bank. The total amount paid by the executors as discount to this bank was the sum of $2,246.69. On the 11th day of June, 1888, the executors made their promissory note as executors for the sum of $3,000, and procured the same to be discounted at the bank of Henry Hamlin; and again, on the 14th day of May, 1889, they made another note for $3,000, which they also discounted at the same bank. The executors renewed these notes from time to time, paying various sums upon the principal, until the first note was reduced to $1,400, and the second to $1,700. The total amount paid by the executors to Hamlin as discount upon these two notes and their various renewals was the sum of $1,082.58. The executors in their account credit themselves and charge the estate with the discount so paid, amounting in all to the sum of $3,329.27. The contestant objects to the allowance of this item. No question is raised but what the executors used the proceeds of these various notes in payment of pressing demands against the estate, yet the conclusion already reached in regard to the application of the bank stock made by the executors necessarily has some bearing upon this question. It is evident that, if this stock had been properly applied by the executors in extinguishment of the liabilities of the estate, the necessity for raising funds with which to pay debts through the instrumentality of repeated discounts would not have existed. The power of executors and administrators to borrow money for the benefit of their estates is restricted, and ordinarily not justifiable. The line of conduct of such representatives is clearly defined by law. They are required to proceed with reasonable diligence in applying the personal estate in the extinguishment of debts. In case of insufficiency of the personal estate the real estate should be resorted to in the manner prescribed by statute relating to the disposition of decedents' real estate for the payment of debts. This the executors have not done.

They have not only delivered the personal estate to the legatees, regardless of debts, but have also permitted the devisees to take possession of the real estate, without taking any measures to meet the debts of the estate. This was, in effect, turning over to the legatees more than they were entitled to receive, and then borrowing money and paying heavy discounts to meet, or rather defer, the payment of valid claims. It has been held that executors are not entitled to be credited with interest paid to raise money for advances to beneficiaries in excess of their distributive shares. Adair v. Brimmer, 74 N. Y. 539–557. The executors are not entitled to be credited with any part of this discount.

The testator, at the time of·his death, and for some years prior thereto, had been a member of the firm of Oosterhoudt & Grimes, and as such engaged to some extent in dealing in lumber. This firm became the owner of three promissory notes made by Hall, Anderson & Co., of East Liverpool, Ohio, dated April 23, 1875. The first was for $776, due in 90 days; the second, for $803.60, due in 6 months; and the third, for $1,219.26, due in 9 months from date, —all payable to the order of Oosterhoudt & Grimes at a bank in East Liverpool. Before the maturity of either note the firm of Oosterhoudt & Grimes indorsed each of them, and procured them to be discounted at the First National Bank of Olean. These notes, when due, were presented at the bank in East Liverpool for payment, and payment denied, and each note protested, and the firm of Oosterhoudt &·Grimes duly charged as indorsers thereon. After their dishonor these notes were delivered by the cashier of the First National Bank of Olean to its attorney, and by him forwarded to one Hall, an attorney at East Liverpool, for collection. The first note was so delivered August 31, 1875; the second, October 30, 1875; and the third, February 25, 1876. Two payments were made on the first note, viz. $450, December 8, 1875, and $249.30, January 3, 1876. Nothing else was paid on either of them, and the First National Bank of Olean continued to hold the notes down to the death of the testator. After his death, and on the 29th day of June, 1885, one Lawton, who was the cashier of this bank, took up these notes, and became the owner of them, paying the bank the amount remaining unpaid thereon, to wit, the sum of $2,863; and thereafter the executors made their own note as executors, and delivered the same to Lawton in place of the original Hall, Anderson & Co.'s notes. Lawton held such new note for a time, but subsequently transferred it to the Cuba National Bank. The executors paid to Lawton, for interest on such note accruing while he held it, the sum of $331.95. They subsequently paid the note to the Cuba National Bank, paying thereon, June 16, 1887, $2,270.20, and on September 15th of the same year the balance, $883.40. The other partner, Grimes, having died intestate, an administrator of his estate was appointed, who transferred to one J. H. Grimes such interest as belonged to his estate in said copartnership affairs, and J. H. Grimes began an action in supreme court against the executors of the Oosterhoudt will for an accounting, claiming a large balance. The executors appeared and

answered, alleging, among other things, the payment of the Hall, Anderson & Co.'s notes. The case was tried before a referee, who reported thereon, finding the facts substantially as herein set forth, and, as matter of law, that the payment by the executors of said notes was unauthorized and illegal, inasmuch as the right of action existing thereon against the indorsc_s, Oosterhoudt & Grimes, was barred by the statute, and judgment was entered thereon, and affirmed on appeal to the general term. Grimes v. Osterhoudt (Sup.) 2 N. Y. Supp. 436. The executors credit themselves in the account filed with the amount paid by them in extinguishment of the Hall, Anderson & Co.'s notes, to which payment the contestant objects.

It is entirely evident that the right of action against the testator upon his indorsement of each of these notes was fully barred by the statute prior to his decease. The evidence shows that Oosterhoudt conferred, from time to time, with the attorney of the bank in regard to the collection of these notes; but it does not show, directly or inferentially, any arrangement or agreement suspending the running of the statute as against the cause of action upon his indorsement. Over eight years elapsed after the testator became charged as indorser, and before his death. During all that time the testator was a resident of the same town in which the bank was located. No legal impediment existed to the bringing of an action in favor of the bank against him at any time during the six years next immediately following the protest of the notes. The original notes having been made and delivered in Ohio, and made payable there, the laws of that state would, of course, regulate the liability of the makers; but the discounting of the notes at the First National Bank of Olean, and the indorsement made for that purpose, were transactions consummated entirely with reference to and governed by the laws of this state. The indorser of a bill or note is regarded as undertaking to pay at the place where his indorsement is made, and he is bound by the laws of the place of indorsement even though the note be expressly payable elsewhere. 2 Daniel, Neg. Inst. § 399. Upon indorsement a new contract arises governed by the laws of the place where it is made. 2 Am. & Eng. Enc. Law, 384; Edmunds, Bills & N. 262. In determining the lex loci contractus the engagements of the maker and indorser of a note are to be treated as independent contracts. Lee v. Selleck, 33 N. Y. 615; Van Staphorst v. Pearce, 4 Mass. 258; Kilgore v. Bulkley, 14 Conn. 362; Cook v. Litchfield, 9 N. Y. 279. Where a party residing in this state holds a note payable in another state, indorses it, and procures it to be discounted here, his contract is that, upon such note being presented where it is payable, and there dishonored, he will pay it here. Artisans' Bank v. Park Bank, 41 Barb. 599. The First National Bank of Olean could have maintained an action against the testator upon his indorsement immediately after the protest of these notes. The right of action accrued at that time, and was barred by the statute at the end of six years.

This demand being barred, it was the duty of the executors to

resist payment. An executor is bound to set up the bar of the statute, and he has no authority to allow a claim so barred as against an estate. A debt so barred, so far as the liabilities of an executor is concerned, is to be regarded as no debt. Butler v. Johnson, 111 N. Y. 204, 18 N. E. 643. An executor cannot be allowed upon his accounting any sum paid by him on such a demand. Bloodgood v. Bruen, 8 N. Y. 362; Bucklin v. Chapin, 1 Lans. 443; Burnett v. Noble, 5 Redf. 69. But it is contended on behalf of the accounting executors that this demand was adjusted and paid by consent of all the heirs, including the contestant. Mrs. Smith did undoubtedly acquiesce in such payment, but the evidence is somewhat conflicting in so far as it relates to the contestant's participation in such arrangement. Mrs. Smith, the wife of the executor, testified as follows:

"Q. After a time, was there any talk in the family about a claim that Mr. Lawton had against the estate? A. Yes, sir. Q. More than once? A. Yes, sir. Q. Where did it take place? A. Always at my father's house in the city. Q. How many different conversations can you remember that took place when Mrs. Allen was present? A. I can't remember. I heard it talked so much I can't give any number at all. It was always talked so much that we were all tired of it. Q. You may relate the different conversations had in respect to this matter? A. I can't tell; only that my mother always said that it was to be paid; that my father's honor was to be preserved under any circumstances. Q. Was this matter talked over there in the family before the arrangement was made with Mr. Lawton for the payment? A. Yes, sir."

On her cross-examination this witness testified as follows:

"Q. I don't understand you to claim that Mrs. Allen ever consented that this Lawton debt should be paid, did you? A. I have never heard the slightest objection. Q. You don't claim that you ever heard Mrs. Allen consent that this Lawton debt be paid? A. Only by silence giving consent."

The executor Smith testified that on one occasion the subject of the payment of this debt was discussed between himself and wife and Mrs. Allen, the executor Oosterhoudt and the widow, and that he (Smith) informed them that he had seen Lawton, and looked the matter over, and become convinced that the testator had had the money, and that the widow said, if they were convinced that testator had had the money, she wanted it paid; and, quoting from his testimony,

"My wife said, I think, that she wanted it paid, and Mr. Oosterhoudt (the executor) wanted it paid, and I think Mrs. Allen expressed herself in so many words; but I am not able to say. Q. What, if anything, did Mrs. Allen say? A. Mrs. Allen said the only objection she had to paying it was that old Lawton would get it; that she had always despised the man. That is all, in substance. Q. Was there anything more said? A. We said we were going to pay it. Q. Did Mrs. Allen say anything else? A. No, sir. Q. Was it after you had stated that you were going to pay it that Mrs. Allen made the remark you have stated she did make? A. Yes, sir."

The evidence of the other executor throws no light on this subject. The contestant gave her version of the transaction as follows:

"Mr. Smith said that Lawton had been down to the mill again, hounding Frank about that debt. I said I did not think the claim ought to be paid. I gave my reasons. I said that my father said that he was not to pay it, and that his children should never pay it. I remember that my mother said she did not

see why Lawton expected the estate to pay it. Pa had said that he ought not to pay it. At that time Smith said that he didn't think we ought to pay it. I know that I said, on that occasion, that I objected to it on the ground, just as I did at first, that my father said he shouldn't pay it, and that none of his children should pay it; that it was not his to pay. Q. Did Mr. Smith ever say, in your presence, that he intended to pay it? A. No, sir. Q. When did you first learn that the claim had been paid? A. The fall of 1889."

This was substantially all the evidence bearing upon this proposition. The most that the executors can claim from the evidence presented on their behalf, if entirely uncontradicted, was that when the subject of paying this claim was discussed in the family the contestant expressed no dissent; that she remained silent. So the question presented is simply this: The executors proposed, in the presence of the contestant, to pay an outlawed claim. The contestant makes no response. Does silence, under such circumstances, establish consent or acquiescence, constituting estoppel? It is stated, as a rudimentary principle, that:

"When a man has made a declaration or representation, or caused, or in some cases not prevented, a false impression, or done some significant act, with intent that others should rely and act thereon, and upon which others have honestly relied and acted, he should not be permitted to prove that the representation was false, or the act unauthorized or ineffectual, if injury would occur to the innocent party who had acted in full faith in its truth or validity." 2 Pars. Cont. 793, c. 4, § 4.

If the contestant had made any positive declaration of assent, which had been acted upon by the executors, she would not now be permitted to question their authority. She would be estopped under the principle above enunciated. But mere silence on her part cannot have that effect. To constitute an estoppel, there must have been some act or admission by the contestant inconsistent with the claim she now makes, done with the intention of influencing the conduct of the executors, and which she had reason to believe would, in fact, have that effect. Silence will not estop, except in those cases where there is not only a right, but a duty to speak. Rubber Co. v. Rothery, 107 N. Y. 310, 14 N. E. 269; Viele v. Judson, 82 N. Y. 32; Diffenbach v. Vogeler, 61 Md. 370. The only reasonable construction to be given to the entire evidence bearing on this question is that the contestant expressed a decided and positive objection to the payment of this claim when the matter was discussed in her presence, and that, so far as she was concerned, the executors were unauthorized to make the payment.

But there is another feature of this case absolutely precluding the right to allow this credit to the executors upon this accounting. The account filed, as already stated, concedes that there is a large amount of unpaid indebtedness existing against the estate. This accounting is an intermediate one. The creditors are not parties to this proceeding, not having been cited. They are interested in the determination of this question, which must be disposed of in the same manner as if the creditors were present and objecting to the allowance of this claim. Whatever arrangement may have been made between the executors and the heirs with reference to

the payment of the Lawton claim, the creditors are not bound thereby; there being no pretense that any of the creditors assented thereto. After the death of the testator and the probate of the will, the dividends declared upon the bank stock owned by the testator were paid to the widow to the time of her death. Seven dividends of $300 each were so declared and paid to her. It is claimed on the part of the contestant that the executors should account for and be charged with such dividends. The representative of the estate of the widow was not cited upon this accounting; consequently the determination of this question should be postponed until the final judicial settlement of the accounts of the executors.

The propositions to which I have referred are the principal ones involved in this litigation. There are numerous other subjects of controversy to which I have not alluded in this decision, but I have endeavored to make my findings of fact sufficiently explicit in regard to each, that there may be no misapprehension as to the conclusions to which I have arrived. A decree will be entered in conformity to my findings of fact and conclusions of law herewith submitted.

Ordered accordingly.